David J. Libowsky
BRESSLER, AMERY & ROSS, P.C.
325 Columbia Turnpike, Suite 301
Florham Park, NJ 07932
Telephone: (973) 514-1200
Facsimile:  (973) 514-1660
dlibowsky@bressler.com

Steven E. Fineman (*pro hac vice* forthcoming)
Daniel P. Chiplock (*pro hac vice* forthcoming)
Michael J. Miarmi (*pro hac vice* forthcoming)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

*Attorneys for Plaintiffs*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SENZAR HEALTHCARE MASTER FUND, LP and BLUE ROCK LIQUID ALPHA FUND, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; J. MICHAEL PEARSON; HOWARD B. SCHILLER; ROBERT L. ROSIELLO; DEBORAH JORN; ARI S. KELLEN; and TANYA CARRO, <br><br> Defendants. | Civil Case No. _____ <br><br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE OF THE ACTION ....................................................................... 1

II.   JURISDICTION AND VENUE .................................................................. 6

III.  PARTIES ................................................................................................... 6

    A.    Plaintiffs ...................................................................................... 6

    B.    Defendants ................................................................................... 7

IV.   DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S
    BUSINESS MODEL AND MANIPULATED THE COMPANY'S FINANCIAL
    RESULTS ................................................................................................. 8

    A.    Defendants Made Numerous False or Misleading Statements Regarding
        Valeant's Business Model and Financial Results. ................................. 8

    B.    Defendants' Statements Were False or Misleading When Made Because
        Valeant Was Engaged in a Fraudulent Scheme to Charge Exorbitant Prices
        for Its Drugs. ..................................................................................... 15

        1.    Valeant's business model relied on massively increasing the prices
            for drugs it acquired. ................................................................. 15

        2.    Defendants further concealed from investors that Valeant created a
            secret pharmacy network to insulate its branded drugs from generic
            competition, inflate prices, and book fictitious sales. ........................ 20

        3.    Defendants also concealed from investors that Valeant deceptively
            used "patient assistance programs" to facilitate its fraudulent
            pricing scheme. ....................................................................... 30

        4.    Valeant's fraud was further illustrated—though not revealed to
            investors—through an inquiry and ultimate lawsuit by R&O
            Pharmacy ................................................................................. 33

V.    DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S
    RELATIONSHIP WITH PHILIDOR AND OTHER PURPORTEDLY
    INDEPENDENT ENTITIES ..................................................................... 36

    A.    Defendants Made False or Misleading Statements Regarding Valeant's
        Control over Third-Party Distributors and Its Association with Variable
        Interest Entities. ................................................................................. 36

    B.    Defendants' Representations were False or Misleading When Made, in
        Light of Valeant's Relationship with Philidor. ................................... 38

VI.   AS A RESULT OF DEFENDANTS' MISCONDUCT, VALEANT'S
    FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND IN
    VIOLATION OF GAAP ........................................................................... 39

    A.    Valeant Improperly Recognized Philidor Revenue. ........................... 40

i

# TABLE OF CONTENTS
(continued)

Page

B. Defendants Concealed the Impact of Philidor Transactions, as Well as the Massive Price Increases for Valeant Drugs, on the Company's Revenues. ........ 41

C. Valeant Failed to Report Philidor as a VIE. ....................................... 44

VII. DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S INTERNAL CONTROLS, LEGAL COMPLIANCE, AND THE INTEGRITY OF ITS REPORTED FINANCIAL RESULTS .................................................. 46

A. Defendants Made False or Misleading Statements Regarding Valeant's Internal Controls. ................................................................. 46

B. Defendants Touted Valeant's Commitment to Compliance. ............................. 47

C. Pearson, Schiller, and Rosiello Signed SOX Certifications Attesting to the Truthfulness and Accuracy of Valeant's Reported Financial Results. ............... 48

D. Defendants' Statements Were False or Misleading When Made, in Light of the Rampant Misconduct at Valeant................................................. 50

VIII. DEFENDANTS FALSELY REASSURED INVESTORS OF THE SOUNDNESS OF VALEANT'S BUSINESS PRACTICES AND FINANCIAL RESULTS AMIDST QUESTIONS RAISED BY OTHERS ........................................... 54

A. Defendants Made Numerous Reassurances in Response to Questions or Concerns Raised in 2014, Mostly in Connection with Valeant's Attempted Acquisition of Allergan................................................................. 55

B. Defendants' Reassurances in 2014 Were False or Misleading When Made, and Kept Investors in the Dark About the Fraud Pervading Valeant. ................ 60

C. Defendants Continued to Reassure Investors in Response to Questions or Concerns Raised in 2015, Even After Valeant Was Forced to Disclose Certain Previously Concealed Facts Regarding Philidor.................................. 62

D. Defendants' Reassurances in 2015 Were False or Misleading When Made, Notwithstanding Their Partial Disclosure of Previously Concealed Facts Regarding Philidor.................................................................. 74

IX. THE TRUTH REGARDING DEFENDANTS' MISSTATEMENTS AND OMISSIONS WAS REVEALED TO INVESTORS THROUGH A SERIES OF PARTIAL DISCLOSURES ............................................................ 77

A. Disclosures in September and October 2015 ....................................... 77

B. Disclosures in November and December 2015....................................... 91

C. Disclosures in February and March 2016 .......................................... 96

D. Disclosures from April to August 2016 ........................................... 104

X. PLAINTIFFS' RELIANCE ...................................................... 109

A. Plaintiffs Are Entitled to a Presumption of Reliance.............................. 109

# TABLE OF CONTENTS
(continued)

**Page**

B. Plaintiffs Directly Relied on Defendants' Misstatements or Omissions. .......... 111

XI. DEFENDANTS ACTED WITH SCIENTER .............................................................. 113

A. The Individual Defendants Played a Critical Role In Valeant's Business Strategy. ............................................................................................. 114

B. The Individual Defendants Were Intimately Familiar with Valeant's Relationship with Philidor. .............................................................. 119

C. Valeant Refused to Pursue Remedies Against Wrongdoers. ............................ 121

D. The Stream of Executive Departures Amidst the Fallout from the Fraud at Valeant Further Indicates Defendants' Scienter. ................................................. 122

E. Pearson Actively Misled Bill Ackman, a Significant Valeant Investor............. 124

F. Defendants Had Significant Financial Motives to Defraud Investors. .............. 126

1. Valeant's executive compensation system gave Defendants a strong incentive to artificially inflate the prices of Valeant securities. ........................................................................................ 126

2. Defendants inflated Valeant's stock price to facilitate the Company's acquisitions. ............................................................. 128

XII. CLAIMS FOR RELIEF .............................................................................................. 129

COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 (AGAINST ALL DEFENDANTS)........................................................ 129

COUNT II VIOLATION OF SECTION 18(A) OF THE EXCHANGE ACT (AGAINST DEFENDANTS VALEANT, PEARSON, AND SCHILLER) .................................... 131

COUNT III VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST DEFENDANTS VALEANT, PEARSON, SCHILLER, AND ROSIELLO)............... 132

XIII. PRAYER FOR RELIEF .............................................................................................. 133

XIV. JURY DEMAND ......................................................................................................... 134

Plaintiffs Senzar Healthcare Master Fund, LP and Blue Rock Liquid Alpha Fund, L.P. (together, "Plaintiffs" or the "Funds"), by and through their undersigned counsel, bring this federal securities action against Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), as well as former senior executives J. Michael Pearson, Howard B. Schiller, Robert L. Rosiello, Deborah Jorn, Ari S. Kellen, and Tanya Carro (collectively, "Defendants"). Plaintiffs seek to recover damages for losses they suffered on transactions in Valeant stock, notes, and options between April 2014 and October 2016 due to false or misleading statements or omissions by Defendants during the period January 4, 2013 to August 10, 2016, inclusive ("Relevant Period"). Plaintiffs' allegations are informed by, among other things, (1) documents Valeant filed with the U.S. Securities and Exchange Commission ("SEC"); (2) Valeant press releases; (3) transcripts of Valeant conference calls; (4) publicly available media articles concerning Valeant; (5) securities analysts' reports concerning Valeant; and (6) documents made public through congressional hearings concerning Valeant, which reference internal Valeant documents, including e-mails.[1]

## I.     NATURE OF THE ACTION

1.      Plaintiffs assert claims under the Securities Exchange Act of 1934 ("Exchange Act") arising from Defendants' scheme to generate revenues through massive price increases for

---

[1] In accordance with Local Rule 10.1, Plaintiffs provide the following information regarding the named parties: (i) Plaintiffs are investment vehicles affiliated with Senzar Asset Management, LLC, which maintains its principal executive offices at 400 Madison Avenue, Suite 14D, New York, NY 10017; (ii) Defendant Valeant Pharmaceuticals International, Inc. maintains its United States headquarters at 400 Somerset Corporate Boulevard, Bridgewater, NJ 08807; (iii) Defendant J. Michael Pearson's address is 74 Village Road, New Vernon, NJ 07976; (iv) Defendant Howard B. Schiller's address is 40 Montview Avenue, Short Hills, NJ 07078; (v) Defendant Robert L. Rosiello's address is 55 Davis Hill Road, Weston, CT 06883; (vi) Defendant Deborah Jorn's address is 6 Firethorn Court, Warren, NJ 07059; (vii) Defendant Ari S. Kellen's address is 694 Downing Street, Teaneck, NJ 07666; and (viii) Defendant Tanya Carro's address is 231 Ronan Way, Branchburg, NJ 08853.

Valeant-branded drugs while concealing from investors the truth regarding the Company's business operations, financial results, and other material facts.

2.     Valeant's business model centered on growth by acquiring drugs from other companies and charging third party payors ("TPPs"), pharmacy benefit managers ("PBMs"), and others enormously high prices for them. In implementing that strategy, Valeant completed more than 100 acquisitions since 2008 for more than $30 billion, which the Company financed through its positive cash flow and debt issuances, including billions of dollars in notes sold to investors. Valeant's acquisitions afforded the Company access to a diverse portfolio of drugs, and its business model appeared successful to investors:   The Company reported $7.71 billion of revenue for the first three quarters of 2015, $8.25 billion for 2014, $5.76 billion for 2013, and $3.48 billion for 2012. As of July 2015, Valeant was valued at over $90 billion, making it the largest pharmaceutical company headquartered in the United States.

3.     Defendants made numerous statements to investors throughout the Relevant Period regarding (a) Valeant's business model and financial results; (b) Valeant's relationship with entities over which the Company purported to have limited or no control; (c) Valeant's commitment to compliance with governing laws and regulations; (d) the adequacy of the Company's internal controls; and (e) the truthfulness and accuracy of the Company's financial statements, as certified by its senior executives under the Sarbanes-Oxley Act of 2002 ("SOX"). But in making those representations, Defendants concealed critical information from investors, rendering Defendants' statements false or misleading in several respects, as summarized immediately below and further detailed in ¶¶ 29-183 and in the accompanying Appendix[2]:

---

[2] For ease of reference, Plaintiffs do not set forth in the body of this Complaint all substantially similar false or misleading statements in their entirety, but rather identify examples of them here and present them in more detail in the accompanying Appendix.

4.      *First*, Valeant's business strategy relied on a series of deceptive practices, which drove the Company's revenues from its key dermatology, neurology, and other products. Those practices included massive price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors (including insurance companies), physicians, and others to obtain reimbursement for Valeant's high-priced drugs.

5.      *Second*, Defendants' business model relied on improper practices by Philidor RX Services, LLC, a specialty mail-order pharmacy Defendants set up along with a host of shell companies owned through Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States. Unbeknownst to investors, (a) Philidor was formed to increase the sales prices of Valeant drugs and avoid substitution of those drugs with less-expensive generic competitors; (b) Valeant employees worked at Philidor; (c) Valeant was Philidor's only client and had the ability to shutter its business; (d) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (e) Valeant was consolidating Philidor's financial results as its own, and had obtained explicit rights to direct Philidor's activities; and (f) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling drugs in states where it did not obtain, or had been denied, a license.

6.      Further, Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to

3

prevent the substitution of generic equivalents for Valeant-branded drugs. Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to take into account Valeant's waivers of patient copays.

7. *Third*, Valeant's reported revenues, earnings per share ("EPS"), and financial forecasts to investors during the Relevant Period depended on the Company's ability to continue to conceal its deceptive practices and did not accurately portray the Company's financial performance and business prospects. To that end, Valeant improperly recognized Philidor-related revenue, in violation of U.S. Generally Accepted Accounting Principles ("GAAP"), causing Valeant's revenues, net income, and EPS to be materially misstated during the Relevant Period.

8. *Fourth*, Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations.

9. *Fifth*, Defendants' undisclosed practices significantly increased Valeant's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, and decreased sales. Valeant thus was not, as Defendants represented to investors, employing a "lower risk, output-focused research and development model," but rather subjecting the Company to enormous risk.

10. Defendants' misstatements or omissions of material fact caused the prices of Valeant securities to be artificially inflated during the Relevant Period, but investors ultimately suffered huge losses when the previously concealed facts were revealed through a series of

partial disclosures beginning in September 2015 and ending in August 2016. *See* ¶¶ 184-275. Those disclosures, taken together, ultimately informed investors that they had been misled to believe the Company was an innovative industry leader when in fact its purported success was predicated on rampant misconduct. The prices of Valeant stock and notes dropped precipitously in response to those revelations. *See id.* Valeant's stock price, for example, fell by more than 90%, from its Relevant Period high of over $262 per share on August 5, 2015 to less than $25 on August 10, 2016. Valeant notes likewise experienced steep declines. In total, the Company's market capitalization fell *$76 billion*.

11.     The revelations of fraud at Valeant also led to the departure of numerous senior executives and directors. Indeed, Valeant has attributed its fictitious accounting to the "improper conduct" of former Chief Financial Officer Howard Schiller and former Corporate Controller Tanya Carro, as well as the unethical "tone at the top" set by senior management. Deborah Jorn, who led Valeant's dermatology division responsible for a substantial portion of Philidor's sales, was also forced out of the Company. And Valeant replaced the majority of its Audit Committee, which had reviewed and approved the Company's accounting with respect to Philidor.

12.     Valeant also withdrew certain of its financial statements, restated its revenue for fiscal year 2014, significantly reduced its revenue and profitability guidance for 2015 and 2016, and admitted the Company's disclosure controls and internal controls over financial reporting were inadequate. Valeant is, moreover, the focus of numerous government investigations, including by Congress, the SEC, and the U.S. Department of Justice ("DOJ").

13.     Plaintiffs assert claims under Sections 10(b), 18(a), and 20(a) of the Exchange Act arising from domestic transactions in Valeant stock, notes, and options during the Relevant Period, on which Plaintiffs suffered damages due to Defendants' misconduct.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action in accordance with Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.     Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act as well as the Fifth Amendment of the United States Constitution.

16.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391. Valeant's United States headquarters are located in this District and the acts and events described in this Complaint, including the dissemination of false or misleading information, occurred in substantial part in this District.

17.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III.    PARTIES

### A.     Plaintiffs

18.     Plaintiff Senzar Healthcare Master Fund, LP, the successor entity (as of January 30, 2015) to Senzar Healthcare Master Fund, Ltd. (together, the "Senzar Master Fund"), is a private investment fund organized as an exempted limited partnership under the laws of the Cayman Islands. During the Relevant Period, the Senzar Master Fund purchased Valeant stock as well as (1) Valeant's 6.125% notes due April 15, 2025 ("6.125% Notes"); (2) Valeant's 6.375% notes due October 15, 2020 ("6.375% Notes"); (3) Valeant's 6.75% notes due August 15, 2018 ("6.75% Notes due 2018"); and (4) Valeant's 7.5% notes due July 15, 2021 ("7.5% Notes"). The Fund also sold Valeant put options during the Relevant Period.

19.     Plaintiff Blue Rock Liquid Alpha Fund, L.P. (the "Blue Rock Fund") is a private investment fund organized as a limited partnership under the laws of Delaware. During the

Relevant Period, the Blue Rock Fund purchased Valeant stock as well as Valeant's 6.125% Notes, Valeant's 6.375% Notes, Valeant's 6.75% Notes due 2018, and Valeant's 7.5% Notes.

20.     The Funds are (and were during the Relevant Period) managed by Senzar Asset Management, LLC ("Senzar"), an investment adviser registered with the SEC whose principal place of business is located at 400 Madison Avenue, Suite 14D, New York, NY 10017. Senzar made investment decisions regarding the Funds' investments in Valeant securities during the Relevant Period.

**B.     Defendants**

21.     Defendant Valeant Pharmaceuticals International, Inc. is a multinational pharmaceutical and medical device company that is incorporated in British Columbia, Canada and maintains its United States headquarters at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey. Shares of Valeant stock trade on the NYSE under the ticker symbol "VRX." The Company also issued notes, which Plaintiffs purchased (*see* ¶¶ 18-19).

22.     Defendant J. Michael Pearson served as Valeant's CEO and a director of the Company from 2008 until May 3, 2016, and as Chairman of the Board of Directors from March 2011 to January 2016. Pearson took a medical leave from January to February 2016, and Valeant announced in March 2016 that he would be replaced.

23.     Defendant Howard B. Schiller served as Valeant's CFO and an Executive Vice President ("EVP") from December 2011 until his resignation on June 30, 2015. Schiller also served as a member of Valeant's Board from September 2012 until June 2016, and as the Company's interim CEO in January and February 2016 while Pearson was on medical leave. On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" related to the Company's accounting restatement and that it had asked him to resign as a director. Schiller refused, and was not proposed as a candidate for reelection to the Board.

24.     Defendant Robert L. Rosiello served as Valeant's CFO and an EVP from July 2015 until his departure from the Company on December 31, 2016. During Pearson's medical leave and before Schiller was appointed interim CEO, Rosiello served as one of the three members of the Company's "Office of the CEO."

25.     Defendant Deborah Jorn served as a Valeant EVP and Company Group Chairman from August 2013 until her departure on March 2, 2016. Jorn joined the Company in connection with its acquisition of Bausch & Lomb, and became general manager of Valeant's U.S. dermatology business.

26.     Defendant Dr. Ari S. Kellen served as an EVP and Company Group Chairman from January 1, 2014 until his departure on December 31, 2016. He briefly served as one of the three members of the Office of the CEO after Pearson went on medical leave and before Schiller was named interim CEO.

27.     Defendant Tanya Carro served at all relevant times as Valeant's Corporate Controller. On March 21, 2016, Valeant announced that Carro had been placed on administrative leave after committing "improper conduct." The Company later announced it had hired a new Controller.

28.     Defendants Pearson, Schiller, Rosiello, Jorn, Kellen, and Carro are referenced collectively in this Complaint as the "Individual Defendants."

## IV.    DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S BUSINESS MODEL AND MANIPULATED THE COMPANY'S FINANCIAL RESULTS

### A.    Defendants Made Numerous False or Misleading Statements Regarding Valeant's Business Model and Financial Results.

29.     Throughout the Relevant Period, Defendants repeatedly misled investors regarding Valeant's business model and financial results, which (together with Defendants' other misstatements or omissions) caused the prices of Valeant securities to be artificially inflated.

30.     On January 4, 2013, the first day of the Relevant Period, CEO Michael Pearson and CFO Howard Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 financial guidance. Pearson and Schiller made several statements concerning Valeant's business model, financial prospects, and the benefits of its new Alternative Fulfillment ("AF") initiative. The AF strategy had been employed at Medicis Pharmaceutical Corporation, which Valeant acquired in or around December 2012. Through the AF initiative, Valeant attempted to have patients take their prescriptions to specialty pharmacies that would assist patients and doctors in obtaining insurance coverage for Valeant drugs rather than generic substitutes, or would provide incentives for patients to purchase Valeant drugs instead of generics. Pearson stated during the January 4 call: "2012 was another very strong year for Valeant. From a top line perspective we added over $1 billion in revenue in 2012 . . . . On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model***."[3]

31.     When asked about pricing for Solodyn, a dermatological product acquired in the Medicis transaction, Pearson responded: "In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer. Through the AF programs, it will allow us our sort of average price internally to go up, because of the way that system works." Pearson also touted the expansion of Valeant's AF initiative:

> Yes, the more we understand about it the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III. And there's some exciting opportunities there that we're not going to give specifics of. And also as we had hoped, we think it will apply to more than just Solodyn. Ziana [used to treat acne] is actually also being—already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.

---

[3] Unless otherwise indicated, all emphasis in this Complaint has been added.

32.     When asked what percentage of Solodyn revenue would go through the AF initiative, Pearson replied:

> [I]t's much - it will be much closer to 50% than 10%, that's for sure. And yes, what we - *the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work*.

33.     On February 28, 2013, Valeant issued a press release and hosted a conference call regarding its 2012 financial results. In response to a question about the AF strategy, Pearson represented: "The program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call." When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth," Pearson stated:

> We have never given details. Medicis never gave details. And that was probably a smart practice. We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not. What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing.

34.     Defendants continued to tout Valeant's purportedly sound and profitable business model throughout the Relevant Period, including through the following representations:

1) During a June 11, 2013 presentation at the Goldman Sachs Healthcare Conference, Schiller stated "it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it."

2) During an August 7, 2013 conference call to discuss Valeant's 2Q13 financial results, Pearson stated: "[W]e're not going to go - therapeutic areas are largely driven by R&D in terms of why people organize that way, and we don't plan to spend - increase our R&D spend as

a percent of sales to what other companies are doing. And we'll continue to focus on both specialty segments and attractive geographic markets."[4]

      3)  In an October 31, 2013 press release reporting its 3Q13 financial results, Valeant represented its "Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and "[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands, our aesthetics and oral health portfolios, our orphan drug products and CeraVe [a line of skincare products]."

      4)  During a January 7, 2014 conference call, Pearson attributed Valeant's "continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders" to "strong organic growth in a fiscally responsible manner for the products that we already own, coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies."

      5)  Defendants made similar representations regarding the Company's AF initiative, "growth" (or "organic growth"), or increasing revenues in (i) Pearson's statements during the Goldman Sachs Healthcare CEOs Unscripted: A View from the Top Conference on January 7, 2014; (ii) Valeant's February 27, 2014 press release discussing its 2013 financial results, as well as its earnings call the same day; (iii) Valeant's May 8, 2014 press release announcing 1Q14 financial results, as well as its earnings call the same day; (iv) Valeant's July 31, 2014 press release announcing 2Q14 financial results, as well as its earnings call the same day; (v) Valeant's October 20, 2014 press release announcing 3Q14 results, as well as its earnings call the same day; (vi) Valeant's January 8, 2015 earnings guidance call; (vii) Valeant's February 22, 2015

---

[4] Plaintiffs refer to Valeant's quarterly results as, for example, "1Q13, "2Q13," "3Q13," and "4Q13," and refer to Valeant's fiscal year results as, for example, "FY14."

press release announcing 4Q14 and FY14 financial results, as well as the Company's February 23, 2015 earnings call; (viii) Valeant's 2014 Form 10-K filed on February 25, 2015; (ix) Valeant's April 29, 2015 press release announcing 1Q15 financial results, as well as its earnings call the same day; (x) Valeant's April 30, 2015 1Q15 Form 10-Q; (xi) Pearson's statements during Valeant's annual shareholders meeting on May 19, 2015; (xii) Valeant's July 23, 2015 press release announcing 2Q15 financial results, as well as its earnings call the same day; (xiii) Valeant's July 28, 2015 2Q15 10-Q; and (xiv) Valeant's October 26, 2015 3Q15 10-Q. *See* App'x at A-1 – A-14.

6)  In its 2013 10-K issued on February 28, 2014, Valeant stated "[g]eneric versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies," and "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care." Valeant made similar statements in its 2014 10-K.

7)  The 2013 10-K also touted Valeant's "lower risk research and development model," which "allow[ed] [the Company] to advance certain development programs to drive future commercial growth, while minimizing our research and development expense." Valeant made similar statements regarding its "lower risk research and development model" in its (i) May 9, 2014 1Q14 10-Q; (ii) August 1, 2014 2Q14 10-Q; (iii) October 24, 2014 3Q14 10-Q; (iv) 2014 Form 10-K; (v) Registration Statement and Prospectus issued in connection with the Company's March 2015 $1.45 billion public offering of 7.3 million shares of common stock

("March 2015 Stock Offering"); (vi) April 30, 2015 1Q15 10-Q; and (vii) July 28, 2015 2Q15 10-Q. *See* App'x at A-4, A-6 – A-11, A-13.

8)  During a February 23, 2015 earnings call, Schiller stated, "The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014."

9)  During an April 22, 2015 earnings call, in response to an analyst's question as to "how much was price versus volume that contributed to growth in 1Q . . . [a]nd what do you factor in your full-year guidance price versus volume," Pearson responded: "***In terms of price volume, actually volume was greater than price in terms of our growth.*** Outside the United States it's all volume . . . . ***And in the US it's shifting more to volume than price, and we expect that to continue*** with our launch brands. A lot of our prices for most of our products are negotiated with managed care. ***And there's only a limited amount of price that we can take***."

10) During Valeant's 2015 annual shareholder meeting on May 19, 2015, Pearson stated "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors."

11) On May 21, 2015, Pearson attended an RBC Capital Markets, LLC Investor Meeting on Valeant's behalf and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

>   (a)   when asked to discuss pricing in the United States, Pearson said that due to managed care contracts, Valeant was "***contractually not allowed to raise prices beyond***" an average of "***5%,***" including in its Dermatology business segment;

>   (b)   while discussing pricing, Pearson said of the Neurology and Other business segment, "***that's where we have the most ability to raise price[s] and play with price***" and raising prices "***is I believe not, at least***

*from your [an investor's] standpoint a bad thing*." Pearson further stated orphan products provided him with the opportunity to be flexible with pricing. He also said Valeant's base plan was around 5% price increases adding that Valeant had raised prices more in certain areas but that "*we don't plan for them, but again if we can take advantage of— during times we've had significant price increases in acquisitions*." Rather than disclosing the deceptive tactics to implement the price increases, Pearson claimed Valeant was able to raise prices by buying products from companies "*that did not price their product the right way*";

(c)     Pearson said they raised the prices of blood-pressure medications Isuprel and Nitropress because Marathon Pharmaceuticals, from which Valeant had purchased those drugs, left money "on the table"; he further claimed the drugs were priced much lower than competitive products, stating they raised prices "*because the drugs were mispriced vs. comparative products*," adding "*that can create lot of value[] for shareholders*'';

(d)     Pearson further stated "*we've been accused of our growth being price and not volume*" but claimed "*organic growth is more volume than price and will continue to be*";[5] and

(e)     Pearson reassured investors "*our accounting practices are fine*" and added "*[w]e get audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint*," and "we never had a financial irregularity.

12) During Valeant's July 23, 2015 earnings call, Pearson was asked about a price increase on the diabetes drug Glumetza and the "extent to which you envision more pricing power . . . broadly speaking, in the U.S.?" He responded:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza—we're going to lose Glumetza within six months—often price increases are taken

---

[5] In a May 21, 2015 email to Pearson with the subject "price/volume," Schiller stated: "Last night, one of the investors asked about price versus volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." Additionally, on May 26, 2015, an RBC analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson was "volume not price is fueling organic growth."

at the end. *So that was just consistent with what most companies do*.

*Our view on pricing*—across most of our portfolio, we do not take prices. Outside the US, there's like zero price. I think, . . . as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. *But our base strategy is, how do we grow organically through volume, which is—I think this quarter, we once again exhibited our ability to do so*.

**B.    Defendants' Statements Were False or Misleading When Made Because Valeant Was Engaged in a Fraudulent Scheme to Charge Exorbitant Prices for Its Drugs.**

**1.    Valeant's business model relied on massively increasing the prices for drugs it acquired.**

35.    Contrary to its representations to investors regarding its growth model and the significance of increasing sales volumes to the Company's financial success, Valeant's business strategy was predicated on massive increases of the prices for its drugs.

36.    Central to Defendants' scheme was their acquisition of drugs used to treat rare medical conditions, or "orphan drugs." Due to the small populations of patients requiring them, orphan drugs faced little to no competition despite being past the point of protection from generics. Additionally, because of the small patient populations, orphan drugs represented smaller portions of hospital and private payor budgets and drew less scrutiny. As a result, Valeant saw orphan drugs as affording a prime opportunity to boost revenue by increasing prices. While the higher prices could attract competition by generics, according to the Pharmaceutical Care Management Association ("PCMA"), generic drugs face a 42-month backlog at the U.S. Food and Drug Administration ("FDA") for approval. Valeant took advantage of that time lag to engage in price gouging to meet financial targets.

37.     Internal Valeant documents released in connection with Congress's investigation of the Company illustrate Defendants' strategy of acquiring drugs and then massively increasing their prices. A February 2, 2016 memorandum from Democratic staff members to Democratic members of the House Committee on Oversight and Government Reform ("House Oversight Committee"), for example, recounts the process by which Valeant purchased Isuprel and Nitropress from Marathon for $350 million "and increased their prices by 525% and 212% overnight."

38.     The House Oversight Committee memo states that e-mails to and from Valeant executives (including Pearson), internal and external Company projections and analyses on revenues and profits, and "public relations strategy documents" indicate Pearson "purchased Isuprel and Nitropress in order to dramatically increase their prices and drive up his company's revenues and profits." The memo makes several other key observations based on the documents, as recounted below.

39.     *First*, the documents demonstrate "Valeant identified goals for revenues first, and then set drug prices to reach those goals." Valeant "employed this strategy for both Isuprel and Nitropress, generating gross revenues of more than $547 million and profits of approximately $351 million in 2015 alone," whereas Valeant's R&D expenses for Isuprel and Nitropress were "nominal."

40.     *Second*, the documents show "Valeant employed a public relations strategy used by other drug companies to distract public attention away from its price increases to focus instead on patient assistance programs, particularly with respect to several Valeant drugs that treat small patient populations." Indeed, the documents indicate "Valeant used its patient

16

assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems."

41.     *Third*, while Valeant officials anticipated both Isuprel and Nitropress would eventually face competition from generics, the documents show that those executives "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly."

42.     *Fourth*, information obtained by the House Oversight Committee "shows that Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress."  Specifically, "[f]rom 2014 to 2015, Valeant increased the prices of more than 20 additional 'U.S. Prescription Products' by more than 200%"; the Company "raised the prices of several of these products multiple times from 2014 to 2015, in some cases by as much as 800%."

43.     Valeant began exploring the acquisition of Isuprel and Nitropress from Marathon (which itself had implemented significant price increases after acquiring the drugs from Hospira) in late 2014. On December 3, 2014, Valeant's Senior VP for Business Development Andrew Davis stated in an email to Valeant's EVP/Company Group Chairman Laizer Kornwasser: "FYI, potential 'Other' opportunity company is [M]arathon, value is largely derived from 2 hospital products they bought from Hospira [i.e., Isuprel and Nitropress] which have no IP [intellectual property protections]." Steven Sembler, Senior VP of Valeant's Neurology/Other Business Unit, responded that those two drugs "make up the VAST majority of revenue" at Marathon and "[t]his would also have to be a price play (if we determine there is upside to take price)."

44.     Defendants worked with consultants from McKinsey & Company as they considered the potential for dramatically increasing the prices of Isuprel and Nitropress. On December 29, 2014, Aamir Malik, the co-leader of McKinsey's global Pharmaceuticals &

Medical Products Practice, stated in an email to Pearson and Davis that those and other drugs "have material pricing potential." McKinsey also noted: "Smaller/older products (e.g., Isuprel and Nitropress) are not reviewed on formulary. . . . Products have been in the system for so long that reviews are practically rubber stamped."

45.     Defendants also worked with Marketing Medical Economics ("MME"), which in a January 16, 2015 presentation titled "Nitropress and Isuprel Pricing Flexibility Review" stated: "With roughly 1 year of data showing essentially static volume performance after a substantial price increase (350%), MME believes pricing flexibility may still exist for [Nitropress] up to the perceptual price point of $1,000 per vial," while the Wholesale Acquisition Cost ("WAC") pricing of Nitropress was $214 per vial.  MME's presentation likewise stated with respect to Isuprel that "[s]imilar to Nitropress, one year of market data does not indicate negative consequence, following a substantial price increase (350%)," and that MME "believes the price for one vial of Isuprel may be adjusted to $700."

46.     Isuprel and Nitropress generated total revenues of approximately $150 million in 2014, but Valeant forecasted an increase to approximately $525 million for 2015.  Indeed, on July 21, 2015, an investment banking advisory firm analyst emailed Valeant's Senior VP for Investor Relations Laurie Little, stating those drugs "have become a meaningful part of EBIDTA [sic] . . . in 1Q15, Marathon products were top 2 products for Valeant!"  The analyst further observed, "Recall, Valeant took 500% price increase on Isuprel in Feb 2015 . . . and yet another 15% price increase in July 2015."  Little forwarded that email to Pearson the same day, stating, "Heading into earnings . . . ."

47.     An outside consultant likewise stated in a March 24, 2015 email to Andrew Davis that price assumptions relating to Isuprel and Nitropress were "leading to high gross margins (more than 99%)."

48.     In response to a July 20, 2015 email from Pearson asking for "updated neuro, dental, and generics forecasts," Brian Stolz, a SVP for Neurology & Other, Dentistry and Generics, stated: "Overall, the numbers are down as Xenezine [used to treat involuntary movements, or chorea, caused by Huntington's disease] looks like it is at risk. . . . Here is what we are planning: Take a price increase this week assuming we get agreement. . . . Take additional price increase on Isuprel and WBXL [Wellbutrin XL]."

49.     An undated presentation summarizing Valeant's neurology business unit included Isuprel and Nitropress among the "[t]op 10 brands responsible for 63% of revenue," and showed Isuprel had "FY 2015 Plan Revenue" of $279.3 million and a "Revenue Contribution" of 14.52%, while Nitropress had "FY 2015 Plan Revenue" of $245.52 million and "Revenue Contribution" of 12.76%.  The presentation noted 2014 revenues for Isuprel and Nitropress were, by contrast, only $54.5 million and $98.7 million, respectively.  The increases, the presentation explained, resulted from "[a]ggressive [p]ricing through consultant recommendation."

50.     Those pricing practices were widespread. According to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis, in 2015 alone Valeant raised prices on its brand-name drugs an average of 66%, approximately five times more than its closest industry peers. For example, 100 capsules of Syprine [used to treat Wilson's disease, a condition in which the body stores too much copper] and 100 capsules of Cuprimine [also used to treat Wilson's disease] were priced at approximately $650 and $450, respectively, in May 2010, but by July 2015 Valeant had raised the prices of Syprine to over $21,000 for 100 capsules (a more than 32-

fold increase) and Cuprimine to over $26,000 for 100 capsules (a more than 58-fold increase), even though Valeant had spent little or no money on additional R&D relating to those medications.

51.     Valeant also significantly increased the prices of other drugs, including (1) Glumetza, from approximately $900 per 90 tablets to over $10,000; (2) Targetin, a T-cell lymphoma drug, from approximately $1,800 per tube to over $30,000; (3) Carac cream, a drug for precancerous legions, from approximately $230 to over $2,800 per tube; (4) Wellbutrin XL, an anti-depressant, which increased 11 times during the Relevant Period (a one-month supply of Wellbutrin XL costs approximately $1,400 while its generic counterpart costs just $30); (5) Addyi, a "Female Viagra" drug, which increased by 100% immediately following Valeant's acquisition of the drug from Sprout Pharmaceuticals; and (6) Mephyton, a drug that helps blood clot, increased eight times since July 2014, from $9.37 to $58.76 a tablet.

> **2.      Defendants further concealed from investors that Valeant created a secret pharmacy network to insulate its branded drugs from generic competition, inflate prices, and book fictitious sales.**

52.     Given the availability of less-expensive generic substitutes for Valeant drugs, Defendants engaged in a series of deceptive practices to evade competition from those products and thus maintain Valeant's artificially successful business model and financial results.

53.     Valeant perpetrated a scheme to funnel sales of its drugs through a nationwide network of captive pharmacies. Through that network, Valeant insulated its products from generic competition by, among other things, flouting statutory or contractual mandates that required substitution of generic equivalents for Valeant drugs, as well as submitting false claims information to TPPs and PBMs. That fraudulent scheme enabled Valeant to massively increase the price of its drugs and inflate the number of claims paid on prescriptions for them. TPPs and PBMs thus overpaid for Valeant's expensive drugs, were prevented from obtaining cheaper

generic alternatives, and paid for drugs that should never have been dispensed.  As a result, Valeant's revenues, and in turn the prices of its securities, were artificially inflated throughout the Relevant Period.

54.     Valeant's captive pharmacy network emanated from Philidor, which Defendants incorporated on January 2, 2013. During the Relevant Period, Philidor was licensed in 45 states and the District of Columbia.[6]

55.     One month before Philidor was incorporated, Valeant hired manager Gary Tanner to act as its special "liaison" with Philidor and help ramp up the pharmacy's operations. And on the same day Philidor was incorporated, Valeant hired Laizer Kornwasser to oversee Valeant's relationship with Philidor. Kornwasser, who supervised Tanner, reported directly to Valeant's CEO, Pearson.

56.     Valeant also placed a 30-person team inside Philidor with instructions to show doctors how to direct patients to Valeant products. At different times, Valeant employees were responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations. To conceal Philidor's connection to Valeant, those employees used aliases when sending emails from Philidor accounts. For example, Bijal Patel, a Valeant employee who also worked for Philidor, was instructed to use "Peter Parker" (i.e., Spiderman) as an alias when sending emails from his Philidor account; other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child) and "Brian Wilson" (of the Beach Boys).

---

[6] Philidor" is a reference to 18th-century chess master Francois-Andre Philidor and his eponymous Philidor defense. Many of the shell companies Defendants used to build their covert pharmacy network likewise had chess-related names.

57.     Additionally, on December 15, 2014, Valeant paid $100 million for the option to acquire Philidor for $0 for 10 years, plus milestone payments based on Philidor's sales. The first milestone payment of $33 million was paid on January 15, 2015, with the remaining milestone payments tied to Philidor hitting sales targets. Valeant's subsidiary KGA Fulfillment Services, Inc. ("KGA") was used to obtain the option to acquire Philidor. The purchase option agreement provided that Philidor was to enter into a purchase agreement with other entities established by Valeant, Isolani, LLC ("Isolani") and Lucena Holdings ("Lucena") (discussed below), as a condition to the acquisition, and stated Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

58.     The Philidor purchase agreement also gave Valeant, through KGA, the right to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes." The agreement documented Valeant's right to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals" in the event of any tie of the joint steering committee members. The joint steering committee also had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."

59.     On December 15, 2014, Valeant and Philidor entered into a distribution and services agreement that superseded the original services agreement between Philidor and Medicis dated January 11, 2013. The new agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify compliance. Defendant Ari Kellen signed on behalf of Valeant and Philidor's CEO Andrew Davenport signed for Philidor. The agreement

covered, among other products, Elidel (used to treat a form of eczema known as atopic dermatitis), Jublia (used to treat toenail fungus), and Solodyn.

60.     After Philidor was formed, Defendants created a host of shell companies tied to it, which they used to acquire interests in smaller retail pharmacies throughout the United States and secretly extend their captive pharmacy network. Indeed, Defendants created a network of at least 76 "phantom" pharmacies by causing Philidor or its affiliates to file with state regulators pharmacy applications on behalf of various shell companies that Valeant and Philidor used to implement their scheme. Defendants caused the shell companies to make false or misleading statements in pharmacy applications filed with state regulators, which failed to disclose the companies' relationship with Valeant and Philidor. The California State Board of Pharmacy ("California Pharmacy Board"), for example, found that Philidor and its CEO Davenport, while under penalty of perjury, falsely represented in an application submitted on or about August 15, 2013 that (1) Alan Gubernick was Philidor's accountant and bookkeeper, when in fact it was Gregory W. Blaszczynski, who (unbeknownst to state regulators) was an employee of BQ6 Media, an instrumentality of Valeant and Philidor; (2) there were no owners or shareholders of, or persons with a beneficial interest in, Philidor, when in fact there were 16; (3) there were no entities with 10% or more ownership interest in Philidor; and (4) Davenport was not an owner of Philidor, when in fact he owned a 27% stake in the company.

61.     On May 16 2014, the California Pharmacy Board denied Philidor's application, finding that Philidor and Davenport knowingly made false statements concerning those topics "with the intent to substantially benefit [Philidor and Davenport]," and that they were therefore "guilty of unprofessional conduct." The Board affirmed its denial of Philidor's pharmacy license in February 2016.

62.   Defendants then caused Lucena, a Valeant/Philidor-controlled shell company, to acquire a stake in a California pharmacy called "West Wilshire Pharmacy" in an effort to circumvent the California Pharmacy Board's licensing denial. In a "Change of Permit Request" filed with the Board on September 24, 2014, Defendants caused Lucena to falsely represent that (1) it did not have a parent company; (2) the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, as noted above, was an employee of Valeant/Philidor instrumentality BQ6 Media; and (3) Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not and had never been "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit . . . was denied," when in fact she was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

63.   Similarly, Philidor caused another shell company, Isolani, to purchase California-based mail order pharmacy R&O in an agreement dated December 1, 2014. After Philidor's purchase through Isolani, R&O began dispensing thousands of prescriptions, dwarfing the size of its business before its acquisition by Philidor/Valeant. Those new prescriptions, all for Valeant drugs, were extraordinarily expensive for simple dermatological conditions like acne or eczema. Only when R&O began its own investigation did it discover the relationship between Philidor and Valeant. *See* ¶¶ 90-100.  In connection with its purchase of R&O, Isolani concealed that relationship from California regulators.

64.   Defendants also misled state regulators in Texas. Defendants caused Back Rank, LLC, a Philidor-controlled shell company, whose managing member James R. Fleming was Philidor's Controller and whose address was the same as a listed Philidor mailing address, to take ownership of Houston-based Orbit Pharmacy, Inc. In a September 2015 application filed

with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent that no state had ever denied a pharmacy application filed by any of "the pharmacy's owner[s] or partner[s]." In fact, as detailed above, California had denied Philidor's pharmacy application the previous year. Orbit's false or misleading representation concealed its connection with Philidor and Valeant from state regulators.

65.     Defendants used Valeant's network of pharmacies to channel prescriptions for Valeant's drugs through Philidor, where Valeant and Philidor employees used various fraudulent means to ensure that Valeant's branded drugs, rather than generics, were dispensed. Defendants' misconduct violated the laws of at least 14 states, which require pharmacists to substitute generic equivalents for branded drugs, as well as contracts between the pharmacies and TPPs or their PBM agents, which typically require the pharmacy to dispense a generic substitute for a branded drug where available.  Further, by minimizing generic substitution, and thus substantially shielding Valeant drugs from generic competition, Defendants inflated the prices of Valeant's drugs far beyond the prices at which they had previously been marketed and sold.

66.     And by concealing Valeant's relationship with Philidor, Valeant's relationships with its network of pharmacies, and the pharmacies' relationships with each other, Defendants were able to spread claims across ostensibly unrelated pharmacies. That practice caused Defendants' misconduct to go undetected by (1) creating the false impression that pharmacies had independently determined to dispense Valeant's high-priced drugs for legitimate reasons and (2) burying fraudulent claims among the large volume of the pharmacy network's claims.

67.     Valeant also did not disclose Philidor in any of its SEC filings during the Relevant Period before October 19, 2015 (*see* ¶¶ 196-204, 210-15). Likewise, Philidor never publicly discussed the nature of its relationship to Valeant before October 19, 2015 (*see* ¶ 207).

68.     Additionally, Defendants made false or misleading statements directly to TPPs, their PBM agents, and their members/beneficiaries to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales. Many aspects of Defendants' fraudulent schemes were catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs.

69.     *First*, Defendants instructed Philidor employees to change codes on prescriptions to require that they be filled with Valeant's drugs as opposed to less-expensive generic alternatives, i.e., to be "dispensed as written." As *Bloomberg* reported on October 29, 2015, former Philidor employees explained that practice was frequently implemented with respect to certain key Valeant dermatological products that encountered repeated denials from TPPs, such as Retin-A Micro (used to treat acne) and Vanos (used to treat skin conditions such as eczema).

70.     *Second*, Defendants used false pharmacy identification information to bill TPPs for prescriptions to bypass the TPPs' denials of claims for reimbursement. Defendants' claims-handling manual instructed Philidor employees to submit claims to TPPs or their PBM agents using Philidor's National Provider Identification Number, or "NPI." If a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging to a different pharmacy in Defendants' captive network—that is, to claim a pharmacy had dispensed a prescription it did not in fact dispense, and in some cases did not even stock.

71.     As reported by *Bloomberg*, Defendants' claims-handling manual instructed employees who received certain denials from TPPs to "submit the NPI for our partner in California, West Wilshire Pharmacy," noting "[t]here is a good chance they are contracted." If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary"—one of Philidor's secret retail pharmacies based out of

Philadelphia, Pennsylvania. The manual stated, "They should then get a paid claim and then Cambria . . . will reimburse us."

72.    Likewise, Defendants routinely caused pharmacies in the Valeant network, including Isolani, to use the NPI belonging to California-based R&O Pharmacy, one of the constituents of Defendants' captive network, to bill for prescriptions R&O had never filled, and in some cases did not even stock. In a July 19, 2015 email to R&O, Philidor CEO Andrew Davenport acknowledged he was aware of that practice.  And in an interview with the Southern Investigative Reporting Foundation, Taylor Geohagen, a former Philidor claims adjudicator during the Relevant Period, confirmed that practice was routinely implemented: "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

73.    To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false or misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which Valeant was secretly associated, falsely representing that the pharmacy had filled certain prescriptions when in fact those prescriptions had been filled by Philidor or one of its other captive pharmacies. Defendants and their agents also misrepresented their authority to approve the audit statements on behalf of the retail pharmacies, and in some cases forged the signatures of principals at those pharmacies. As Russell Reitz of R&O noted in a July 14, 2015 email to Philidor Senior Director Eric Rice, Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed before the execution of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's National Council for Prescription Drug Programs ("NCPDP") number without his knowledge or consent.

74.     *Third*, in submitting numerous prescription renewals for reimbursement, Valeant and Philidor falsely represented to TPPs and their PBM agents that patients had requested renewals of their prescriptions when in fact no such request had been made. As *New York* magazine reported on January 13, 2016, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, notwithstanding that the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills.  As discussed above, Philidor's practice of waiving patient copays in connection with Defendants' fraudulent scheme allowed it to go undetected, as patients were not incentivized to complain about unnecessary refills for which they were not charged a copay.

75.     *Fourth*, when submitting claims to TPPs, Defendants misrepresented to TPPs the dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants' practice of routinely waiving patient copays. The collection of copays from insureds incentivizes them to select generics when available and only refill medications when needed, whereas waiving copays discourages patients from actively avoiding low-value or medically unnecessary medicines. PBM contracts with pharmacies therefore mandate that pharmacies make every attempt to collect the copayment and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied. Defendants routinely waived copays for patients prescribed Valeant drugs, but when submitting claims for such prescriptions Defendants falsely represented to TPPs that the patient had been charged the full price of the drug.

76.     *Fifth*, Defendants made misrepresentations directly to patients to boost Valeant's drug sales. Specifically, Defendants disseminated false statements (including in brochures and coupons) to doctors and patients that falsely promised patients Valeant drugs at no cost only if

they submitted their prescriptions directly to Philidor. By encouraging patients to submit claims directly to Philidor, Defendants ensured that prescriptions for Valeant drugs would not wind up being filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but would instead end up at Philidor, where Valeant's branded drugs would be dispensed. To induce those patients to take advantage of the discounts, the coupons falsely assured them that their TPPs would not be billed.

77.     To further aid their fraudulent enterprise, Defendants made it difficult for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills. For example, Philidor invested very little in creating a call center to handle customer complaints and problems; customers and patients routinely reported that they were directed to sales staff when they tried to report those problems.

78.     Notably, before Valeant's $100 million payment to Philidor, Valeant's senior management and members of the Board, including the entire Audit Committee, went on site visits to Philidor during which Valeant was provided further access and exposure to Philidor's business practices and operations. After the payment, Valeant intentionally avoided disclosing its relationship with Philidor in its financial statements. Defendants concealed from investors (as well as physicians, patients, private payors, and PBMs) the $100 million payment, Valeant's controlling relationship, and that Philidor's financials were being consolidated into Valeant's.

79.     Further, Valeant used that hidden relationship to inflate its revenues. Defendants knew that after the formal consolidation of Philidor was completed, Valeant was prohibited from recording revenue for shipping products to Philidor, because that was tantamount to shipping products to itself. Instead, to enable it to properly recognize revenue, Valeant would have to wait

29

until Philidor shipped the products to patients. Accordingly, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate Valeant's revenue. That manipulative practice clearly violated GAAP. Nevertheless, Schiller, Carro, and the entire Valeant Board approved the accounting with respect to Philidor.

> ### 3. Defendants also concealed from investors that Valeant deceptively used "patient assistance programs" to facilitate its fraudulent pricing scheme.

80. As noted earlier, Valeant further facilitated its fraudulent pricing scheme by systematically causing patient copays for drugs to be waived when submitting claims to insurance companies and other TPPs. The undisclosed copay waivers led patients to obtain higher-priced Valeant drugs rather than lower-priced generic substitutes and to obtain unnecessary refills, whose costs were reimbursed by insurance companies and other TPPs. Had the copays not been waived, patients would have had the incentive to choose lower-cost generics and avoid unnecessary prescriptions. Further, had Defendants properly disclosed their routine waiver of patient copays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs, or paid for them at all.

81. To aid its pricing scheme, Valeant increased its spending on patient assistance programs ("PAPs") by over 11-fold from 2012 to 2015, from $53 million to $600 million, respectively, with expectations to reach over $1 billion in 2016.  When used appropriately, PAPs help ensure that patients without the financial means to purchase high-priced drugs are not deprived of critical medications. But Valeant used its PAPs as another deceptive tactic to conceal its price gouging from private payors, and in turn to reduce patient complaints, minimize patients' refusal to accept unnecessary refills or enrollment in automatic refill programs, and avoid negative publicity.

82.     During a hearing by the U.S. Senate Committee on Aging ("Senate Aging Committee") on April 27, 2016, Senator Elizabeth Warren asked Pearson "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid," to which Pearson acknowledged "we're not allowed to." Senator Warren responded, "Yeah, because it's illegal," further explaining "Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."

83.     Mark Merritt, President and CEO at the PCMA, which represents PBMs, testified before Congress that by providing copay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced TPPs "to pay hundreds of thousands more for the most expensive brands on the formulary." Echoing Senator Warren, Merritt stated "such practices are considered illegal kickbacks in federal programs."

84.     Valeant also directed patients into its secret network of pharmacies and offered discounts as a means to quell any pushback on price increases for its drugs. Valeant developed a PR strategy to divert attention from any negative media regarding patient complaints over massive price increases by highlighting their purported increased PAPs.

85.     An internal Valeant analysis outlining the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser (used to treat pheochromocytoma, a tumor that forms in the adrenal glands) reflected that strategy. The analysis stated "[t]ake initial 25% price increase to drive patients into the restricted distribution model," and noted "[h]igh deductible copay requires increased foundation support." The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine."

86.     Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program." The presentation stated "[t]he program will be funded through planned price increases [i.e. funded by higher prices to payors rather than by Valeant]." The analysis directed claim adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort." The presentation noted Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

87.     The presentation also identified the risks of such tactics (which were concealed from investors), including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's [healthcare providers], payors, and/or government agencies" and "Managed Care plan actions against products could limit/ restrict re-imbursement." To address the risks, the presentation included a "PR Mitigation" plan to "[p]rivately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase."

88.     As part of the PAP and PR strategy, the presentation also encouraged false or misleading responses to inquiries about price increases. A draft Q&A directed that the response to the question "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was: "No. These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable." Valeant's costs of

producing those drugs in fact had not increased and the price increases (which resulted in gross margins exceeding 90%) were not required to keep Valeant commercially viable.

89.     Valeant also targeted its deceptive assistance programs at hospitals and other healthcare providers, which came to light in the Senate Aging Committee hearings. In a letter to Senator Claire McCaskill dated October, 30, 2015, Pearson stated "for those institutions where the impact [of price gouging] was significantly greater, we are beginning to reach out to hospitals to determine an appropriate pricing strategy." Valeant soon announced a 30% discount program. But at the April 2016 hearing, Senator McCaskill noted she had not found a single hospital that had received the discounts. Hospital-affiliated witnesses at the hearing also denied receiving the discounts, and several more sent letters to the Senate Aging Committee stating they had not received any such discounts.

### 4.    Valeant's fraud was further illustrated—though not revealed to investors—through an inquiry and ultimate lawsuit by R&O Pharmacy.

90.     While investors remained unaware of the fraud at Valeant, aspects of the scheme were illustrated through an inquiry by R&O Pharmacy, which its owner Russell Reitz sold to Philidor on December 1, 2014.

91.     Following the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service—dwarfing the customary size of R&O's business. Philidor sent R&O bulk orders of Valeant drugs and Reitz dispensed them to patients directly or by mail. Payment later arrived in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over a million dollars.

92.     Not only was the volume of Philidor-channeled patients unusually large, the prescriptions Philidor was filling were extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Yet most of the overpriced prescriptions R&O

was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel for eczema, and Jublia for toenail fungus.

93.     In March 2015, Reitz received an audit from one of his PBMs, which showed R&O was being used by Philidor to fill thousands of prescriptions across the country. Those prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients Reitz had never heard of and many were for medications R&O did not carry. Some prescriptions were even backdated to dates from before Reitz had sold R&O to Philidor. Those practices continued throughout the summer of 2015, when R&O began investigating Philidor. R&O's investigation uncovered that (as discussed above) Philidor filed an application with the California Pharmacy Board in 2013 that was denied because it contained "false statements of fact." Reitz then realized Philidor had purchased R&O to use it as a channel through which to conduct business in California and circumvent the California Pharmacy Board's denial.

94.     On July 14, 2015, Reitz wrote an email to Philidor Senior Director Eric Rice to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O. Reitz demanded they cease the practices immediately, adding that the agreement required Philidor/Isolani to apply for a permit and asking for all documents relating to the application.

95.     On July 19, 2015, Philidor CEO Andrew Davenport emailed Reitz stating Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you." On July 21, 2015, Rice and several Philidor executives, including Davenport, Philidor's Controller James R. Fleming, and its General Counsel Gretchen Wisehart, flew to California to

meet Reitz at R&O. The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting they "appear[ed] to be engaging in a widespread fraud."

96.     On August 18, 2015, Fleming emailed Reitz suggesting responses to an audit. One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania, where Philidor was based.

97.     On August 31, 2015, counsel for R&O sent a notice of termination to Isolani's law firm, stating "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud." R&O's counsel added "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks." R&O's counsel noted Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts," and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O." Counsel added "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor," and asserted "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors."

98.     In response to Reitz's investigation of Philidor, he received letters from *Valeant's* General Counsel demanding $69 million in payments from R&O. Those letters made clear that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained.

99.     On September 6, 2015, Isolani's counsel sent an email informing R&O's counsel that they were seeking a protective order against Reitz and for an accounting.  R&O's counsel responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential / actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

100.    R&O claimed that it never received a previous invoice from Valeant for any amount and that either Valeant and R&O were "victims of a massive fraud perpetuated by third parties" or "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."  Reitz ultimately filed suit against Valeant.

## V.    DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S RELATIONSHIP WITH PHILIDOR AND OTHER PURPORTEDLY INDEPENDENT ENTITIES

### A.    Defendants Made False or Misleading Statements Regarding Valeant's Control over Third-Party Distributors and Its Association with Variable Interest Entities.

101.    Defendants stated repeatedly during the Relevant Period that "pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control." Defendants made that representation in Valeant's (1) 1Q13 10-Q; (2) 2Q13 10-Q; (3) 3Q13 10-Q; (4) 2013 10-K; (5) 1Q14 10-Q; (6) 2Q14 10-Q; (7) 3Q14 10-Q; (8) 2014 10-K; (9) 1Q15 10-Q; and (10) 2Q15 10-Q. *See* App'x at A-15.

102.     Defendants also repeatedly represented that Valeant had no material association with or exposure to variable interest entities ("VIEs"), defined by GAAP as legal entities subject to consolidation. In its 2013 10-K, for example, Valeant stated "[t]here were no material arrangements determined to be variable interest entities."

103.     Similarly, in the "Business Combinations" section of its 2014 10-K, Valeant stated that during 2014 it "completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate," and that those acquisitions were "included in the aggregated amounts presented" in the 10-K.  Valeant repeated that representation in its 1Q14 10-Q.

104.     Valeant further stated in its 2014 10-K that "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary."

105.     The offering materials issued in connection with the March 2015 Stock Offering also discussed the Company's "Other Recent Acquisitions," but failed to mention Valeant paid $100 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed the Company was "not currently a party to any significant transactions" other than its acquisition of Salix Pharmaceuticals, which was being funded by the proceeds of the stock offering.

106.     The March 2015 Stock Offering materials also stated Valeant's "inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence" and the "pricing and sales volume of certain of our products (or Salix's products) . . . are distributed or marketed by third parties, over which we have no or limited control."

107.    During the Company's July 23, 2015 conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy channels had improved. Valeant's Company Group Chairman Ari Kellen responded:

> ***Yes, the adoption through multiple specialty pharmacies continues***. I think last time we said Jublia was around 50%. That trend continues. For derm[atology] overall, it varies by product, but it's around 40%.

### B.    Defendants' Representations were False or Misleading When Made, in Light of Valeant's Relationship with Philidor.

108.    The statements identified in ¶¶ 101-07 were false or misleading when made because (1) as detailed in ¶¶ 52-79 and 90-100, Philidor was formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant-branded pharmaceutical products and to avoid substitution of Valeant drugs with competing generic products; Valeant employees worked at Philidor; Valeant was Philidor's only client and had the ability to shutter its business;[7] Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor's activities; and those facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors; (2) as detailed in ¶¶ 52-79 and 90-100, Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license; and (3) as noted above and detailed in ¶¶ 109-26 below, Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated.

---

[7] On November 25, 2015, Philidor notified the Pennsylvania Bureau of Workforce Development that it was closing its facilities and laying off its workers. In the notice, Philidor listed Valeant as its only client.

## VI.  AS A RESULT OF DEFENDANTS' MISCONDUCT, VALEANT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED AND IN VIOLATION OF GAAP

109.    Throughout the Relevant Period Valeant's periodic financial statements filed with the SEC represented that Valeant's financial results were prepared in accordance with GAAP. Financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP. *See* Regulation S-X, 17 C.F.R. § 210.4-01(a)(1). That presumption also applies to interim financial statements filed with the SEC. *See* 17 C.F.R. § 210.10-01.

110.    Valeant has admitted that its reported revenues for the financial periods below were overstated by the following amounts during the Relevant Period:

| Financial Period | Amount By Which Reported Revenue Was Overstated |
|---|---|
| 3 months ended Sept. 30, 2014 | $12.9 million |
| 3 months ended Dec. 31, 2014 | $44.6 million |
| 12 months ended Dec. 31, 2014 | $57.5 million |
| 3 months ended Mar. 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended Sept. 30, 2015 | $20.8 million |

111.    Valeant's financial statements during the Relevant Period were materially misstated and violated GAAP (and certain of the Company's critical accounting policies) in numerous ways, including (1) by improperly recognizing Philidor revenue, in violation of GAAP; (2) by concealing Philidor as a VIE, in violation of GAAP as well as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 810, *Consolidation*; (3) by concealing information regarding the impact of Philidor and price increases on its reported revenue and earnings, in violation of SEC disclosure rules; and (4) because Defendants' false or misleading statements were quantitatively and qualitatively

material, including as contemplated by SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality*. Additionally, as detailed in ¶¶ 133-34 below, Defendants falsely certified that Valeant's internal controls over financial reporting and its disclosure controls were effective, in violation of SOX and SEC rules, as well as the Committee of Sponsoring Organizations, Internal Control – Integrated Framework ("COSO Framework").

### A.    Valeant Improperly Recognized Philidor Revenue.

112.    On March 21, 2016, Valeant confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements for fiscal year 2014 and the first nine months of fiscal year 2015, and that, as a result, the Company's 2014 10-K and its 1Q15, 2Q15, and 3Q15 10-Qs could no longer be relied on. Valeant concluded that before its purchase option agreement with Philidor in 4Q14, certain sales transactions involving Philidor were not executed in the normal course of business and collectability was not reasonably assured at the time the revenue was recognized. *See* FASB Accounting Standards Codification Topic 605, Revenue Recognition; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

113.    As discussed earlier, Valeant entered into a purchase option agreement with Philidor on December 15, 2014. Valeant previously had recognized revenue on sales to Philidor when Valeant delivered products to Philidor, i.e., on a sell-in basis. After entering into the option agreement, however, Valeant was required to recognize revenue when Philidor distributed the products to the end customers (patients), i.e., on a sell-through basis.

114.    In 4Q14, leading up to the option agreement's execution, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business, but rather to inflate revenues. As Valeant admitted in its 2015 10-K, those purported sales transactions included "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of

40

the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product." Valeant recorded revenue from those improper sales transactions. Further, after recording revenue on those fictitious sales, and after executing the option agreement, Valeant recognized revenue a second time as Philidor sold the same products to end customers.

115.    With respect to the 4Q14 Philidor transactions, collectability was not reasonably assured at the time the revenue was originally recognized, and thus should not have been recognized. Valeant accordingly acknowledged in its March 21, 2016 press release that the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement.

116.    The Philidor-related misstatements and disclosure violations were each quantitatively and qualitatively material to Valeant's financial statements during the Relevant Period. For example, Valeant emphasized its U.S. organic sales growth and dermatology sales growth throughout the Relevant Period, of which sales to Philidor constituted a material portion. Further, the improperly recognized revenue from Philidor transactions enabled Valeant to meet its "Cash EPS" of $2.58 for 4Q14 and exceed its 4Q14 Cash EPS guidance of $2.55. Had such revenues been properly recognized, Valeant would have missed its guidance and reported Cash EPS of $2.51.

### B.    Defendants Concealed the Impact of Philidor Transactions, as Well as the Massive Price Increases for Valeant Drugs, on the Company's Revenues.

117.    Valeant also failed to disclose the Philidor relationship and its impact on the Company's revenues, as well as Valeant's dependency on price increases, in the Management's Discussion and Analysis ("MD&A") section of each of quarterly and annual report Valeant filed during the Relevant Period.

118.    During the Relevant Period, Valeant repeatedly emphasized U.S. organic sales growth and sales growth in its dermatology segment, as well as the role of volume increases, as opposed to price increases, on its revenue growth. Further, as detailed above, the Valeant pharmacy network and price increases were major drivers of the Company's purported revenue and profitability growth trends during the Relevant Period, including U.S. organic sales growth, dermatology, and neurology sales growth, and overall prescription volume growth. Valeant accordingly was required to disclose Philidor's impact on Valeant's revenue growth. *See* SAB 104. But Valeant failed to disclose those facts in the MD&A sections of its SEC filings until 3Q15.

119.    Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's traditional sales channels. SEC staff provides specific examples of required MD&A disclosures regarding sales channels, including "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns." SAB 104, Topic 13.B. During the Relevant Period, Valeant disclosed "[p]rovisions to reduce gross product sales to net product sales" in its financial statements. The sales provisions as a percentage of gross sales increased significantly throughout the Relevant Period, including increases of 47%, 7%, and 28% in 2013, 2014, and 3Q15, respectively. But Defendants failed to disclose that those significant increases in provisions were tied to deceptive practices, such as routing patients into Valeant's secret pharmacy network and improperly using PAPs. Valeant failed to disclose Philidor as a distinct sales channel and, as a result, Valeant's reported growth was not indicative of future performance.

120.     As described above, Philidor also employed practices to deceive TPPs. As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable. When private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor. As a result, Valeant closed Philidor. The significant financial impact that Philidor's closing ultimately had on Valeant's future financial results, including its revenues and earnings, is the type of information Valeant was required to disclose under the SEC's MD&A rules, i.e., that Valeant's results were not indicative of future results due to the significant negative impact Valeant would suffer were Philidor to close.

121.     Finally, Valeant was required to disclose its price gouging, which constituted a major driver of the Company's revenue and profitability growth trends, in its annual and quarterly reports. Indeed, at the April 27, 2016 hearing of the Senate Aging Committee, Pearson testified that Valeant's 1Q13 to 3Q15 revenue growth and profitability were driven primarily by price, not volume. When asked if he could name a single drug that Valeant acquired where it did not raise the price, Pearson responded "[n]ot in the United States." In light of those facts, Valeant was required to disclose its dependency on, and the impact of, price increases on its reported revenues and earnings, as Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 229.303, explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues. Moreover, in SAB 104, SEC staff makes it clear that an analysis of volume and price changes affecting changes in revenue are required MD&A disclosures. As detailed above, Valeant's dependency on price increases and their impact on Valeant's reported revenues were concealed from investors during the Relevant Period.

122.     The SEC MD&A rules require disclosure of material events that would cause reported financial information to not necessarily be indicative of future operating performance.

Because of the unsustainable nature of Valeant's deceptive practices, Valeant was required to disclose the practices and associated risks and that its financial performance was not indicative of future results. As discussed in Section X below, in October 2015 Valeant provided certain disclosures regarding price and volume as part of its 3Q15 earnings presentation, which were not provided earlier in the Relevant Period. Valeant's October 19, 2015 investor presentation, for example, showed that through the first nine months of 2015, volume for the Company's neurology business had declined 7% while net realized price had increased 30%—thus demonstrating that without price increases, revenues for neurology would have declined. As another example, Valeant doubled its revenues from Wellbutrin XL from 2013 to 2015, despite declining volume, by repeatedly increasing the drug's price. Valeant provided similar disclosures about price and volume in its 1Q16 10-Q filed on June 7, 2016 and in its earnings conference call that day. *See* ¶¶ 265-67. But during the Relevant Period, in violation of SEC rules, Valeant failed to provide adequate disclosures showing how increases or decreases in price and volume impacted its revenue growth.

123.    Valeant's 10-Ks and 10-Qs were also materially false or misleading because they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues, and income from continuing operations, as required by Item 303.

### C.    Valeant Failed to Report Philidor as a VIE.

124.    Valeant also failed to disclose Philidor as a VIE. Under FASB Accounting Standards Codification Topic 810, *Consolidation* ("ASC 810"), a company must disclose in its financial statements both unconsolidated and consolidated VIEs. In its October 26, 2015 investor presentation, Valeant admitted it had considered Philidor a VIE before entering into the purchase agreement. *See* ¶¶ 212-13. Accordingly, under ASC 810 Valeant was required to determine if

Philidor needed to be consolidated in its financial statements. The relevant test for determining if a VIE should be consolidated is determining whether or not the company is the "primary beneficiary" of the VIE.

125.   In its October 26, 2015 presentation, Valeant claimed it was not the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014. But ASC 810's guidance nonetheless required disclosure of material unconsolidated VIEs. Accordingly, before the December 15, 2014 option agreement, Valeant was required to disclose its unconsolidated VIE relationship with Philidor because it was material. In particular, Valeant was required to disclose in its pre-December 2014 financial statements (1) quantitative and qualitative information about its involvement with Philidor, including Philidor's nature, size, purpose, activities, and how it was financed; and (2) the methodology for Valeant's purported conclusion that it was not the primary beneficiary of Philidor, including disclosure of key factors, assumptions, and significant judgments used in making that determination. *See* ASC 810-10-50-5A. Instead, in violation of GAAP, Valeant stated in its 2013 10-K that "[t]here were no material arrangements determined to be variable interest entities."

126.   Further, following the execution of the purchase option agreement (when Valeant purportedly concluded it was the primary beneficiary of Philidor and consolidated Philidor's financial results), Valeant was required under ASC 810 to disclose, in addition to the information discussed immediately above, which factors resulted in a change of the reporting with respect to the VIE (Philidor), including the impact of the change on Valeant's consolidated financial statements. *See* ASC 810-10-50-5A. Valeant failed to disclose that information in its 2014 10-K. Valeant also failed to make additional VIE-related disclosures necessary to comply with ASC 810's principal disclosure objective of providing users of the Company's financial statements

45

with information concerning (1) significant judgments and assumptions made in determining whether Valeant needed to consolidate Philidor or disclose information about its involvement with Philidor; (2) the nature of, and changes in the risks associated with, Valeant's involvement with Philidor; and (3) how Valeant's involvement with Philidor affected the Company's financial position, financial performance, and cash flows. *See* ASC 810-10-50-8. But Valeant did not make any required disclosures related to its VIE relationship with Philidor until the Company's 3Q15 10-Q.

## VII.  DEFENDANTS MISLED INVESTORS REGARDING VALEANT'S INTERNAL CONTROLS, LEGAL COMPLIANCE, AND THE INTEGRITY OF ITS REPORTED FINANCIAL RESULTS

127.    Defendants represented throughout the Relevant Period that (1) Valeant's management evaluated the effectiveness of the Company's disclosure controls and procedures, and concluded they were effective; (2) compliance was "very, very important" to the Company; and (3) as mandated by SOX, Valeant's reported financial results were not impacted by fraud. Those representations were false or misleading when made, however, in light of the rampant misconduct at Valeant.

### A.    Defendants Made False or Misleading Statements Regarding Valeant's Internal Controls.

128.    In its 1Q13 10-Q, Valeant stated:

> Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013.

That assurance to investors was likewise included in Valeant's (1) 2Q13 10-Q; (2) 3Q13 10-Q; (3) 2013 10-K; (4) 1Q14 10-Q; (5) 2Q14 10-Q; (6) 3Q14 10-Q; (7) 2014 10-K; (8) 1Q15 10-Q; (9) 2Q15 10-Q; and (10) 3Q15 10-Q. *See* App'x at A-16 – A-18.

129.     Additionally, Valeant's 2013 10-K included Management's Conclusion, signed by Pearson and Schiller, "that our internal control over financial reporting was effective as of December 31, 2013."

130.     And Valeant's 2014 10-K, signed by Pearson and Schiller, included "Reports of Management on Financial Statements and Internal Control over Financial Reporting," stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP").   In preparing these consolidated financial statements, management selects appropriate accounting policies and uses its judgment and best estimates to report events and transactions as they occur. ***Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.***

**Internal Control Over Financial Reporting**

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014***.

**B.     Defendants Touted Valeant's Commitment to Compliance.**

131.     On July 29, 2013, in connection with Valeant's acquisition of Bausch & Lomb, Valeant filed a Form 8-K attaching a memorandum to employees of the merging companies and a copy of the anticipated organizational chart of the combined entity. In the memorandum Valeant described its "Organizational Design and Philosophy":

In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe / recommend them and the customers who provide retail outlets for these products. Healthcare companies

are held by society to the highest possible ethical standard—and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective.

* * *

Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on . . .

* * *

Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements.

132.    Similarly, on Valeant's August 7, 2013 earnings call, Pearson assured investors there were no increased compliance risks accompanying Valeant's non-traditional business model, stating:

> *In terms of compliance, compliance is obviously very, very important for us*. When people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the very top of the list of the positive is ethical. So our employees really do appreciate it. ***That's our most important thing that—that comes before everything***.

### C.    Pearson, Schiller, and Rosiello Signed SOX Certifications Attesting to the Truthfulness and Accuracy of Valeant's Reported Financial Results.

133.    Beginning in Valeant's 1Q13 10-Q and continuing in all of the Company's other 10Qs and 10Ks during the Relevant Period, Pearson (as to all of those filings), Schiller (as to filings before 2Q15), and Rosiello (as to the 2Q15 and 3Q15 10-Qs) each signed certifications pursuant to Sections 302 and 906 of SOX attesting that, among other things:

1)      the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report";

2)      "[b]ased on [his] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition,

48

results of operations and cash flows of the Company as of and for, the periods presented in th[e] report";

       3)     Pearson, Schiller, and/or Rosiello (a) "[d]esigned . . . disclosure controls and procedures, or caused . . . disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the Company,  including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which this report is being prepared"; (b) "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with [GAAP]"; (c) "[e]valuated the effectiveness of the Company's disclosure controls and procedures and presented in th[e] report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by th[e] report based on such evaluation"; and (d) "[d]isclosed in th[e] report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that ha[d] materially affected, or [wa]s reasonably likely to materially affect, the Company's internal control over financial reporting"; and

       4)     Pearson, Schiller, and/or Rosiello "[d]isclosed, based on [their] most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

       a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which [we]re reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

b.     Any fraud, whether or not material, that involve[d] management or other employees who ha[d] a significant role in the Company's internal control over financial reporting."

134.    Those representations were also included in Valeant's (1) 2Q13 10-Q; (2) 3Q13 10-Q; (3) 2013 10-K; (4) 1Q14 10-Q; (5) 2Q14 10-Q; (6) 3Q14 10-Q; (7) 2014 10-K; (8) 1Q15 10-Q; (9) 2Q15 10-Q; and (10) 3Q15 10-Q. *See* App'x at A-18 – A-21.

### D.    Defendants' Statements Were False or Misleading When Made, in Light of the Rampant Misconduct at Valeant.

135.    The statements recounted in ¶¶ 128-34 above were false or misleading when made, in light of the facts detailed in ¶¶ 35-126. In sum:

(a)    Valeant's business strategy relied on a series of deceptive practices, which drove the Company's growth in revenues and sales of its key dermatology, neurology, and other products. Those practices included massive price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors, physicians, and others to obtain reimbursement for Valeant's high-priced drugs.

(b)    Defendants' business model relied on improper practices by Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States. Unbeknownst to investors, (1) Philidor was formed to increase the sales prices of Valeant drugs and to avoid substitution of those drugs with competing generic products; (2) Valeant employees worked at Philidor; (3) Valeant was Philidor's only client and had the ability to shutter its business; (4) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (5) Valeant was consolidating Philidor's results as its own, and had

obtained explicit rights to direct Philidor's activities; and (6) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not obtain, or had been denied, a license.

(c)     Further, Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to prevent the substitution of generic equivalents for Valeant-branded drugs. Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to take into account Valeant's waivers of patient copays.

(d)     Valeant's reported revenues, EPS, and financial forecasts to investors during the Relevant Period depended on the Company's ability to continue to conceal its deceptive practices and did not accurately portray the Company's financial performance and business prospects. To that end, Valeant improperly recognized Philidor-related revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated during the Relevant Period.

(e)     Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations.

(f)     Valeant's undisclosed practices significantly increased the Company's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, violations of contracts, decreased sales, and heightened public

scrutiny. Valeant thus was not, as Defendants represented to investors, employing a "lower risk, output-focused research and development model," but rather a strategy that subjected the Company to enormous risk.

(g)    The SOX certifications referenced above falsely stated the accompanying SEC filings did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made in those filings not misleading.

136.    Additionally, SOX required the use of an appropriate framework in making the assessments to which Pearson and Schiller attested in their SOX certifications, such as the COSO Framework. During the Relevant Period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework.

137.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity. As a result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate that a company's control environment is ineffective include "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee." *See* Exchange Act Release No. 54976 (Dec. 20, 2006). The concept of "tone at the top" has become widely accepted within the accounting profession to describe the attitude and actions of a company's senior management toward internal financial controls and the control environment. Indeed, SEC staff has referred to the tone set by top management, i.e., "the corporate environment or culture within which financial reporting occurs," as "the most important factor contributing to the integrity of the financial reporting process." *See* SEC Staff Accounting Bulletin No. 99.

138.   Control deficiencies that are determined to constitute a "material weakness" must be disclosed in management's annual report on its assessment of the effectiveness of the company's internal controls over financial reporting.[8] Management may not disclose that it has assessed its internal financial controls as effective if there is one or more control deficiencies determined to be a material weakness. *See* Exchange Act Release No. 54976. Indicators of material weaknesses in a company's internal controls over financial reporting include (1) identification of fraud, whether or not material, on the part of senior management; (2) restatement of previously issued financial statements to reflect the correction of a material misstatement; (3) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (4) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. *See* AS 5.

139.   The misconduct detailed in this Complaint demonstrates that Valeant's internal controls during the Relevant Period were woefully inadequate. Indeed, Valeant has admitted that material weaknesses in its internal financial controls existed during the Relevant Period, and that its disclosure controls and procedures were not effective. Specifically, on March 21, 2016, the Company disclosed:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal

---

[8] Public Company Accounting Oversight Board Auditing Standard No. 5 ("AS 5") defines a "material weakness" as a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

\* \* \*

[A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

140.   Valeant's 2015 10-K, filed with the SEC on April 29, 2016, confirms the Company's ineffective financial controls, including the existence of two separate material weaknesses as of December 31, 2014 (i.e., the improper "tone at the top" and the failure to detect the Philidor accounting fraud).

## VIII.   DEFENDANTS FALSELY REASSURED INVESTORS OF THE SOUNDNESS OF VALEANT'S BUSINESS PRACTICES AND FINANCIAL RESULTS AMIDST QUESTIONS RAISED BY OTHERS

141.   On several occasions during the Relevant Period, questions or criticisms regarding Valeant's business practices and financial results arose. Rather than admit to the rampant misconduct at Valeant, Defendants aggressively challenged those questions and concerns, and vehemently reassured investors that the Company's practices were sound and its financial results accurate. But those statements served only to perpetuate Defendants' fraud and further mislead investors, ensuring that the prices of Valeant securities remained artificially inflated throughout the rest of the Relevant Period.

**A.   Defendants Made Numerous Reassurances in Response to Questions or Concerns Raised in 2014, Mostly in Connection with Valeant's Attempted Acquisition of Allergan.**

142.   On April 22, 2014, Valeant issued a press release stating "it ha[d] submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock." In total, the unsolicited offer to acquire Allergan, the maker of Botox (a popular anti-wrinkle treatment), was valued at approximately $46 billion. The release disclosed that the proposal was made with the full support of investor Bill Ackman and Pershing Square, his hedge fund, which had accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's largest shareholder.

143.   On May 12, 2014, Allergan issued a press release rejecting Valeant's unsolicited bid, stating its board of directors "believes that the Valeant business model is not sustainable." During a conference call that day, Allergan's Chairman and CEO referred to "the unsustainability of Valeant's business model," emphasized Valeant's lack of organic growth, and cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

144.   On May 20, 2014, Valeant issued a press release announcing it would be hosting an investor meeting and webcast on May 28, 2014 "to respond to assertions Allergan has made that the Valeant model is not sustainable." The release continued: "Our goal for this meeting is ***to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation***."

145.   On May 27, 2014, Allergan filed a Form 8-K attaching a slide presentation titled "Certain Potential Business Risks and Issues With Valeant Pharmaceuticals International, Inc.,"

which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)." It asserted that much of Valeant's growth was attributable to "unsustainable price increases - not volume." The presentation also noted Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

146.   On May 28, 2014, Valeant issued a press release announcing it had substantially increased its merger proposal for Allergan by raising the cash consideration, bringing the total consideration to approximately $49 billion. Also that day, the Company hosted its previously announced investor meeting and conference call attended by Pearson, Schiller, and Deborah Jorn, during which they refuted Allergan's claims:

(a)   Pearson said they would provide investors with "a much deeper understanding of our operating model and why we believe it is sustainable for many years to come" and show that "when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth";

(b)   Jorn emphasized the launch of "additional access programs so that patients can get the medicines that their physician prescribes for them";

(c)   Jorn further represented that "in 2014 we have returned the business to growth" and highlighted the growth of dermatology products, including Solodyn and Acanya (medications used to treat acne, which were sold through Philidor):

> **We have returned many of our core promoted brands to growth.** We have new managed care capabilities, *we have launched additional access programs so that patients can get the medicines that their physician prescribes for them.*
>
> * * *
>
> So what type of growth are we talking about? ***It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn.*** We entered the year with 49% share, branded share of the dermatology space. We are now up at 51% and as you can see, our competitors have issues. Doryx

[used to treat acne] has been declining and Monodox [also used to treat acne] is flat. We are very proud of this accomplishment.

Further, *we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya* [also used to treat acne]. Despite loss in some major accounts in managed care, we have been able to achieve this;

(d)       Pearson concluded the presentation by claiming Valeant "has delivered strong organic growth since I have been here," further stating "[w]e are very transparent" and "our basic underlying growth rate is about 8%"; and

(e)       During a question-and-answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase. Pearson claimed Valeant was "limited" to "9%" price increases in dermatology and denied all of Allergan's claims, stating: "We are limited. For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc.  So that is what limits. It is managed care in the United States."  He continued:

I think we showed that when *we went through the 10 points that Allergan asserted* which was based on just looking at conventional sources *and it is just not applicable to the way we run our business. And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at*.

147.    Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of the Company, where he responded to several questions about price, volume, and the sufficiency of Valeant's disclosures.

(a)       With regard to price and volume, Pearson stated:

The only country in the world that you can really sustainably increase pricing is the United States. *And in the United States, you're governed by managed care contracts. And the managed care contract—the highest price increase we could take under any managed care contract we have in the US is 9% a year.*

57

*So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. So, we focus on volume growth, and the vast majority of our growth on a global basis—and we went through some of that this morning - is volume.*

(b)     Addressing why Valeant did not provide more detailed disclosures on product sales, Pearson represented, "*We're more like a generics company in terms of the amount of revenue we get per product*," adding "[it] just makes no sense" to make such disclosures; and

(c)     Pearson was also asked if others were copying Valeant's business model and said they were transparent in what they were doing but it was hard to execute, claiming: "[A]s Howard [Schiller] always says, it's not a very easy model to replicate. It's very simple. We tell you exactly what we're doing. But it's very hard. It requires working really, really hard, sweating the details every day."

148.    On June 17, 2014, Pearson and Schiller hosted a conference call "to refute recent misleading assertions made by Allergan":

(a)     During his opening remarks, Pearson represented:

I am pleased to update all of you that our business is continuing to perform well. I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness. . . . *In short, our business is strong and I can assure you our operating model is both durable and sustainable*.

In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.

First, the products listed in the presentation are not Valeant's top 15 products by revenue. Only 6 of the products listed are in Valeant's top 15 products. *The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price*.

(b)     Pearson continued to respond to assertions regarding Valeant's organic

growth and price increases later in the call: "I think the other thing we will probably start doing again is price volume. ***People - a lot of assertions are that it's all about price, but it's not.***" He further stated:

> So I think what we're talking about earlier this morning is ***probably we will report what the volume and price parts of our organic growth are. And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is.***

      (c)    He also represented that "[o]ur sales force in dermatology now has been stable for a few quarters and . . . ***all our promoted products in dermatology are growing.***"

149.    On July 18, 2014, Valeant issued a press release announcing it had filed an investor presentation with the SEC that would be used in meetings with Allergan's institutional investors and proxy advisors. The presentation, titled "Investor Presentation Regarding the Allergan Special Meeting Process," included the following "Valeant Operating Principles":

- Put patients and our customers first by maintaining the highest ethical standards in the industry;
- Select high-growth business segments (therapeutic areas and geographies) where the healthcare professional is still the primary decision maker; [and]

* * *

- Ensure tight controls and rigorous compliance standards while avoiding overspending.

150.    On August 19, 2014, the Company filed with the SEC a "[c]larification on assertions made about Valeant's business," which purported to respond to statements made by Allergan in its August 5, 2014 press release and in an August 15, 2014 *Financial Times* article. Among other things, Valeant stated its "Promoted Pharmaceutical brands (i.e. Dermatology, Dental) are growing from a combination of price and volume" and "[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established."

59

151.    On September 11, 2014, Valeant filed with the SEC a letter sent by Pearson to the Company's employees referencing Allergan's "attack[s] [o]n our business" and "our business model and our track record of organic growth." In the letter, Pearson stated "[h]ighlights across Valeant's businesses" included "return to growth of our U.S. Prescription Dermatology business, including the Obagi Medical business, coupled with the early, but exciting launch successes of Jublia and Luzu [an antifungal medication]" and "continued tremendous growth in our U.S. Neuro & Other and OraPharma businesses."

152.    On October 20, 2014, Allergan filed with the SEC a response to Valeant's 3Q14 financial results, and Valeant responded by filing a document titled "October 20th rebuttal items." Valeant there rebutted Allergan's assertion that "price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses," stating:

- Overall price/volume for the Valeant business was ~50% volume and ~50% price.

- Like all PhRMA [Pharmaceutical Research and Manufacturers of America] companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.

- Gross price increases could be seen as higher but do not contribute to our reported net sales growth.

**B.      Defendants' Reassurances in 2014 Were False or Misleading When Made, and Kept Investors in the Dark About the Fraud Pervading Valeant.**

153.    The statements identified in ¶¶ 142-52 were false or misleading when made, for the reasons detailed in ¶¶ 35-140 above. In sum:

(a)      Valeant's business strategy, and the key growth driver of dermatology sales, depended to a significant degree on the undisclosed practices of (1) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50% on July 18, 2014); (2) routing patients

into Valeant's network of controlled pharmacies that appeared independent, when in fact they were not; (3) using PAP and PR practices to avoid patient scrutiny; and (4) not disclosing those practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if those practices were disclosed to private payors, patients, physicians, and PBMs;

(b)     although not disclosed to private payors, patients, physicians, PBMs, or investors, Valeant employees worked at Philidor, Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products, and Valeant was consolidating Philidor's results as its own;

(c)     Valeant's business risks had materially increased as a result of the undisclosed practices discussed in subparagraph (a) above, which exposed the Company to regulatory sanctions, investigations and associated costs, reputational harm, contractual violations, decreased sales, and nonpayment/substitution of Valeant products by PBMs, private payors, and physicians;

(d)     Valeant's purportedly high-growth businesses, including its dermatology business, had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in subparagraph (a) above, and any slowdown or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(e)     while Valeant's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and could be substituted by pharmacies, the undisclosed practices described in subparagraph (a) above allowed the Company to avoid such substitution;

(f)     Valeant's reported revenue, EPS, and profitability, as well as its future

business prospects and ability to service its debt, depended on the Company's ability to continue the undisclosed practices in subparagraph (a) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray the Company's financial performance and business prospects;

(g)     Valeant lacked adequate internal controls, as well as compliance and training programs, to ensure that its SEC filings and other public disclosures were not false or misleading when made;

(h)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's revenues, net income, and GAAP EPS to be materially misstated; and

(i)     in violation of GAAP, Valeant failed to disclose Philidor as a VIE.

154.   Defendants' false or misleading reassurances had the intended effect of continuing to conceal from investors the true state of Valeant's business operations and financial results, and thus kept the prices of Valeant securities artificially inflated.

**C.     Defendants Continued to Reassure Investors in Response to Questions or Concerns Raised in 2015, Even After Valeant Was Forced to Disclose Certain Previously Concealed Facts Regarding Philidor.**

155.   On September 28, 2015, Valeant filed a Form 8-K attaching a letter from Pearson to the Company's employees responding to claims that its "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement." In his letter:

(a)     Pearson referred to those concerns as a "bear thesis," claimed they were "incorrect on both accounts," and dismissed the dependency on price increases, stating "Valeant is well-positioned for strong organic growth, even assuming little to no price increases";

(b)     He added, "[a]s we have stated many times, ***Valeant's core operating***

*principles include a focus on volume growth* and a concentration on private and cash pay markets that avoid government reimbursement in the U.S.," and "the majority of our portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases*";

(c)     Pearson went on to "lay out the facts," noting in part that (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "delivered over 30% script growth year to date," and (ii) Valeant expected "double-digit script growth and corresponding revenue growth trends to continue" in the "Salix business"; and

(d)     He added, "we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals."

156.    On October 14, 2015, Valeant issued a press release noting it received subpoenas from the DOJ for documents regarding its patient assistance and distribution practices. The release quoted Pearson as stating "[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."

157.    On October 19, 2015, Valeant issued a press release announcing its 3Q15 financial results. The release stated: "Same store sales organic growth of 13%; 5th consecutive quarter of > 10% organic growth, driven by: Continued outperformance of U.S. businesses, particularly dermatology and contact lens . . . ."

(a)     As discussed in ¶¶ 196-202 below, by that time Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship.  To offset the negative impact on the price of Valeant securities, the Company raised revenue and EPS guidance for 4Q15 and full year 2015, stating:

4Q15 Guidance

- Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]

- Cash EPS increased to $4.00 - $4.2 0 [midpoint of $4.10] from $3.98 - $4.18 [midpoint of $4.08]

Full Year 2015 Guidance

- Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion] from $10.7 - $11.1 billion [midpoint of $10.9 billion]

* * *

- Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]; and

The press release quoted Pearson as stating, "With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016."

158.    That same day, Pearson, Rosiello, and Kellen hosted a conference call. In an accompanying slide presentation, Defendants again touted Valeant's product portfolio, including Xifaxan (used to treat Irritable Bowel Syndrome and other conditions), which the Company had acquired through its acquisition of Salix. Defendants highlighted, among other things, that Xifaxan generated $148 million in revenue for 2Q15 and $220 million in revenue for 3Q15.

159.    The slide presentation also included a list of anticipated "Questions from Investors." One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which Valeant responded in the presentation:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages;

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies;

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients;

* * *

- We understand that Philidor:

  - Provides services under our programs for commercially insured and cash- paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs;

  - Does not restrict prescriptions it fills to any particular manufacturers (including Valeant); and

  - Dispenses generic products as specified in patient's prescription or as requested by patient.

160.    During the call, Pearson repeated some of the same claims:

The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions ***by some, we will provide an update to this call.***

***Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.***

161.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."

65

162.     In reference to media and government scrutiny of Valeant's pricing practices, Pearson represented:

> [I]t's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies. I do think given that environment, the pricing that pharmaceutical companies will take in the future will be more modest, and **we built that into our forecast for next year**.

163.     Regarding the lawsuit filed by R&O Pharmacy (*see* ¶¶ 97-100), Pearson reassured investors that the business practices of Valeant and Philidor were proper:

> **R&O is one of the specialty pharmacies in our network**, and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. **R&O is currently improperly holding significant amounts it receives from payers**. We will refrain from comment on active litigation, and **look forward to showing in court that we are owed the money**.

164.     Also during the conference call, Rosiello repeated the increased guidance from that day's press release, adding "[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi, and decreased sales of Xenazine." His statements were accompanied by the following chart in the slide presentation:

| | Previous Q4 2015 | New Q4 2015 | Previous full year | New full year 2015 |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4B | $3.25 - $3.45B | $10.7 - $11.1B | $11.0 - $11.2B |
| Cash EPS | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj.     Cash Flow     from Operations | NA | NA | >$3.2B | >$3.35B |

165.     To further alleviate any investor concerns and buoy the price of Valeant's securities, the Company also stated in the slide presentation that it was "reaffirming our

expectations to exceed $7.5 [billion] in EBITDA in 2016." When Pearson was asked during the conference call how the lack of price increases going forward might affect the Company's ability to meet EBITDA guidance in 2016, he responded, in part, "today . . . we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that."

166.    On October 21, 2015, Valeant issued a press release responding "to recent accusations made regarding its financial reporting and operations" by online investment newsletter Citron Research that Valeant was inflating revenues through its secret network of pharmacies. The release represented, in part:

- All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient.    All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – *there is no sales benefit from any inventory held at these specialty pharmacies* and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

*  *  *

- The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.

167.    Additionally, Valeant's 3Q15 10-Q filed on October 26, 2015 disclosed that the Company had the "power to direct Philidor's activities" and stated Valeant's entire Board had reviewed Valeant's accounting for Philidor and confirmed its appropriateness: "During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, *which were not material individually or in the aggregate*." Valeant further stated:

> *On October 26, 2015, the Company also announced that its* Audit and Risk Committee and the full Board of Directors have reviewed the Company's

accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.

> ***As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Gross product sales for products dispensed through Philidor Rx Services, LLC*** ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) ***are recognized when a prescription is dispensed to a patient***. Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively.

The Company also touted its financial performance:

> Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. ***The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia***® (launched in mid-2014), (ii) the ***Retin-A***® franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) ***Solodyn***®, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®.

Additionally, Valeant discussed its purportedly "lower risk" business model:

> The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.

168.    On October 26, 2015, Valeant issued a press release designed to alleviate any investor concerns, in which the Company:

(a)    repeated that its "Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting

treatment";

(b)    quoted Pearson as stating "[a]s we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and "[w]e operate our business based on the highest standard of ethics, and we are committed to transparency"; and

(c)    quoted director Robert Ingram as stating that the Board "has fully supported the company's specialty pharmacy strategy," and that Pearson "operates with the highest degree of ethics.''

169.    Also on October 26, 2015, Valeant hosted a conference call with investors, which was accompanied by a presentation. Pearson, Schiller, Rosiello, Kellen, Ingram, and Controller Tanya Carro, as well as directors Norma Provencio, Theo Melas-Kyriazi, and Katharine Berghuis Stevenson, participated in the call on behalf of the Company. Valeant disclosed in the presentation that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program," and further stated:

(a)    "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels";

(b)    "We do not own or control Philidor . . ." and "Philidor employees do not report to Valeant";

(c)    "Philidor is independent"; and

(d)    "Unless and until Valeant exercises the option to acquire Philidor, *Philidor remains independent* and Valeant has no rights to remove CEO or management."

170.     Pearson also assured investors there was no improper accounting or other improper practices involving Philidor, stating:

(a)     "we stand by our accounting treatment of Philidor completely";

(b)     "[w]e follow the law and we comply with accounting and disclosure rules'';

(c)     "[T]he sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue. His motivation is the same as someone who runs into a crowded theater to falsely yell fire. He wanted people to run";

(d)     "after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill [i.e., Cahill Gordon & Reindel LLP] to make a request that the SEC investigate Mr. Left and Citron";

(e)     "We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. ***There have been no issues with regards to the accounting or revenue recognition of the business***.''; and

(f)     "We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor."

171.     Ingram, speaking on behalf of the entire Board, reaffirmed those representations:

As Mike [Pearson] stated, the Company stands by its accounting completely. The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment.

172.     Rosiello echoed Pearson's and Ingram's representations, stating:

(a)     "Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate";

(b)     "Valeant recognizes revenue only when products are dispensed to

patients, and Valeant records this at net realized price";

> (c)    "There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients"; and

> (d)    "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014. ***The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee***."

173.    Carro also defended Valeant's accounting and lack of prior disclosure regarding Philidor, representing that:

> (a)    as of year-end 2014, "***Philidor is not considered to be material to Valeant's business for reporting purposes***" at the end of 2014 because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

> (b)    for the first two quarters of 2015 "***Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements***," as "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

174.    Additionally, Schiller reassured investors that there was no evidence of wrongdoing by Pearson:

> [I]f I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board. It's as simple as that. When we announced that I was

71

> leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing.

175.    To mitigate the impact of the negative news disclosed on that call, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating: "Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections, excluding the one-time expenses associated with recent events." He added, "we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion."

176.    On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."[9]  Pearson stated:

> We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients.  We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.

177.    An analyst noted during the call that there were "two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and observed that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor." With regard to Philidor, Pearson responded, in part:

> Well Philidor was very specific. First, there was the Citron report which claimed financial fraud and other things. They quickly came out and there was

---

[9]  As discussed below (*see* ¶ 223), in late October 2015 Valeant announced that it would be terminating its relationship with Philidor and that Philidor would be shutting down.

> no financial fraud, in terms of Valeant had to do. But then other allegations
> were made in terms of the practices of Philidor. And we felt, both management
> and the Board felt that given these allegations, given what was happening to
> our stock price and given what many of our major shareholders were asking us
> to do that the best thing to do was to sever.

178.    On December 16, 2015, Valeant issued a press release formally withdrawing the

inflated guidance it had issued less than two months earlier, on October 19, 2015. Attempting to

offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its

lost sales through Philidor and increased scrutiny by PBMs and private payors, in the release

Valeant projected robust 2016 growth with revenue of $12.5 billion-$12.7 billion, cash EPS of

$13.25-$13.75, and EBITDA of $6.9 billion-$7.1 billion.

179.    The same day, Valeant hosted an "Investor Day" presentation. Pearson, Rosiello,

Jorn, and Kellen participated on behalf of the Company. During the call:

(a)      Pearson touted Valeant's "very strong controls, in the areas of finance,

compliance, audit, pharmacovigilance";

(b)      He further stated "we're continuing to grow, grow, grow, generate cash

flow";

(c)      Pearson added: "Addyi . . . a lot of people have said, Addyi is a disaster;

***today you'll see it's not a disaster. So we believe we'll sell between $100 million and $150***

***million in sales of Addyi next year***."

(d)      Rosiello repeated Defendants' 2016 guidance;

(e)      Pearson stated: "***I feel very comfortable with the guidance***. But each

little pieces [sic], I feel little less comfortable this year just given - ***so we put an extra dose of***

***conservatism in***."

180.    Also during that call, Defendants referred to an accompanying presentation titled "Valeant: An Enduring Engine for Growth," which represented, among other things, that the "[d]rivers of Valeant's success" included "[o]ur relentless focus on providing easy and affordable access for physicians and patients"; "[o]ur innovative strategies (often disruptive), which have challenged industry convention"; and "[o]ur decentralized model and talented people, which give us a competitive edge (speed of decision making and in-depth customer knowledge)."

181.    In the presentation, Defendants also touted Valeant's agreement with Walgreens, announced on December 15, 2015, under which consumers would be able to access Valeant's dermatology and ophthalmology products from Walgreens U.S. retail pharmacy locations as well as participating independent retailers. Defendants represented, among other things, that Valeant had created an "even better, branded access program with Walgreens" than Valeant's prior "partnership" with Philidor, further stating the program with Walgreens was "simpler for patients and physicians" than the Philidor program had been. Defendants' statements were aimed at convincing investors that Valeant's newly announced arrangement with Walgreens would allow the Company to recapture volume lost due to the termination of Valeant's relationship with Philidor.

**D.    Defendants' Reassurances in 2015 Were False or Misleading When Made, Notwithstanding Their Partial Disclosure of Previously Concealed Facts Regarding Philidor.**

182.    Despite disclosing some previously concealed information about Philidor, Defendants' representations identified in ¶¶ 155-81 above were false or misleading when made because they failed to disclose numerous material facts regarding Valeant's actual business practices and financial results, as detailed in ¶¶ 35-140 above. In sum:

(a)    Valeant's business strategy, and the key growth driver of dermatology

sales, depended to a significant degree on the undisclosed practices of (1) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50% on July 18, 2014); (2) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in fact they were not; (3) using PAP and PR practices to avoid patient scrutiny; and (4) not disclosing those practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if those practices were disclosed to private payors, patients, physicians, and PBMs;

(j)     Notwithstanding Valeant's partial disclosures regarding Philidor, Defendants falsely stated Philidor was independent of Valeant, when in fact, among other things, Valeant employees worked at Philidor and Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products—not, as Pearson represented during the Company's November 10, 2015 conference call, to "deliver better, faster customer service for doctors and patients" or "to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim";

(k)     Valeant's business risks had materially increased as a result of the undisclosed practices discussed in subparagraph (a) above, which exposed the Company to regulatory sanctions, investigations and associated costs, reputational harm, contractual violations, decreased sales, and nonpayment/substitution of Valeant products by PBMs, private payors, and physicians;

(l)     Valeant's purportedly high-growth businesses, including its dermatology business, had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in

subparagraph (a) above, and any slowdown or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(m)     while Valeant's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and could be substituted by pharmacies, the undisclosed practices described in subparagraph (a) above allowed the Company to avoid such substitution;

(n)     Valeant's reported revenue, EPS, and profitability, as well as its future business prospects and ability to service its debt, depended on the Company's ability to continue the undisclosed practices in subparagraph (a) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray the Company's financial performance and business prospects;

(o)     Valeant lacked adequate internal controls, as well as compliance and training programs, to ensure that its SEC filings and other public disclosures were not false or misleading when made; and

(p)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's reported revenues, net income, and GAAP EPS to be materially misstated.

183.    Defendants' false or misleading reassurances had the intended effect of continuing to conceal from investors the true state of Valeant's business operations and financial results, and thus kept the prices of Valeant securities artificially inflated through the remainder of the Relevant Period.[10]

---

[10] The "safe harbor" afforded by the Private Securities Litigation Reform Act of 1995 to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements identified in this Complaint, because (i) they were historical statements or statements of current facts and conditions at the time the statements were made; and (ii) to the extent any of those statements can be construed as forward-looking, they were not accompanied

*Footnote continued on next page*

IX.   **THE TRUTH REGARDING DEFENDANTS' MISSTATEMENTS AND OMISSIONS WAS REVEALED TO INVESTORS THROUGH A SERIES OF PARTIAL DISCLOSURES**

184.   Defendants' misstatements and omissions caused the prices of Valeant stock and notes to be artificially inflated throughout the Relevant Period. Through a series of partial disclosures commencing in September 2015 and ending in August 2016, the truth emerged regarding Valeant's business operations, financial condition, and prospects. As Defendants' false or misleading statements and omissions were revealed to the market, the prices of Valeant stock and notes declined precipitously. As the artificial inflation was removed from the prices of those securities, Plaintiffs and other investors suffered damages.

A.   **Disclosures in September and October 2015**

185.   On September 28, 2015, *Bloomberg* reported that all Democratic members of the House Oversight Committee had sent a letter to Chairman Jason Chaffetz urging him to subpoena Valeant. In the letter, those Congressmen stated:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm. The same day, Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%). When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

186.   The September 28, 2015 letter also revealed that on July 31, 2015, staff members from the House Oversight Committee participated in a call in which Valeant representatives

---

*Footnote continued from previous page*

by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded in this Complaint, Defendants are nonetheless liable for those statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew the statement was false or misleading when made.

"failed to adequately answer our questions about the basis for their skyrocketing prices." The letter also revealed that on August 12, 2015, "Ranking Member [Elijah] Cummings sent [a] document request to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

187.    Also on September 28, 2015, *The Washington Post* disclosed that Senator Claire McCaskill "sent a detailed list of 22 questions to [Valeant], probing its simple explanation that it increased two heart drug prices because they were 'significantly underpriced.'" Citron Research published a report the same day revealing that Valeant had more than doubled the price of 30 other drugs during the Relevant Period, stating: "Martin Shkreli [founder and CEO of Turing Pharmaceuticals] was created by the system. Shkreli is merely a rogue trying to play the gambit that Valeant has perfected." The report also highlighted that "Valeant has made little to no effort to improve these products."

188.    On September 28 and 29, 2015, media outlets reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice of "engag[ing] in a business strategy of buying old neglected drugs and turning them into high-price specialty drugs," and noted Valeant was using the same business model as Turing. (Shkreli resigned from Turing three months later following his indictment by federal authorities on securities fraud charges.)

189.    In response to those developments, Valeant filed a Form 8-K on September 28, 2015 (*see* ¶ 155) attaching a letter it had distributed to its employees in which Pearson attempted to address concerns that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."

190.    In response to the partial disclosures on September 28 and 29, 2015, the price of

Valeant stock dropped more than 16%, from a close of $199 per share on Friday, September 25,

2015, to a closing price of $166 per share on Monday, September 28, 2015, on unusually high

trading volume. The price of Valeant stock continued falling the following day, dropping an

additional 5% to close at $158 per share on September 29, 2015, also on unusually high trading

volume. The total stock price decline over that two-day period was over 20%, or $41 per share.

Additionally, from the close on Friday, September 25 to the close on Monday, September 28,

2015, the prices of certain Valeant notes declined. For example, the 6.125% Notes declined

5.6%; the 6.375% Notes declined 1.2%; the 6.75% Notes due 2018 declined 0.6%; and the 7.5%

Notes declined 3.1%. Further, for example, the 6.375% Notes declined 1.5% from the close on

September 28 to the close on September 29, 2015.

191.    On October 4, 2015, *The New York Times* questioned Pearson's September 28,

2015 letter to Valeant employees. The *Times* article called into doubt, among other things,

Pearson's claim that Valeant was well-positioned for growth even without price increases. The

article noted that extraordinary price increases on eight Valeant drugs accounted for

approximately 7% of the Company's revenue and 13% of its earnings before taxes and interest in

the second quarter, and provided insight into Valeant's dependency on price gouging compared

to the rest of the pharmaceutical industry, citing a Deutsche Bank finding that in 2015, "Valeant

raised prices on its brand-name drugs an average of 66 percent . . . about five times as much as

its closest industry peers."  The article cited Mephyton, a drug that helps blood clot, as an

example of price gouging, noting the drug had seen eight price increases since July 2014, costing

$58.76 a tablet, up from $9.37. The article cited additional examples, such as Glumetza, a

diabetes pill acquired from Salix, whose price was increased over 800% during the year, with a month's supply rising from approximately $500 to $4,600.

192.    On that news, the price of Valeant stock declined by more than 10%, falling from a close of $182 per share on Friday, October 2, 2015 to a close of $163 per share on Monday, October 5, 2015, on unusually high trading volume.  Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 1.79%; the 6.375% Notes declined 0.49%; the 6.75% Notes due 2018 declined 0.3%; and the 7.5% Notes declined 0.3%.

193.    On October 14, 2015, Valeant issued a press release disclosing that the Company had recently received subpoenas from prosecutors in the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York. The subpoenas did not only relate to Valeant's drug pricing practices, but also sought information about the Company's PAPs and distribution practices. Following disclosure of the subpoenas, Pearson assured investors that the Company believed in "maintaining strong regulatory and financial controls" and "believe[d] we have operated our business in a fully compliant manner." Valeant further stated it "responded to a letter from Senator Claire McCaskill" regarding the pricing of Nitropress and Isuprel and the "reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions." The Company noted it was "beginning outreach to hospitals where the impact of a price change was significantly greater than average."

194.    On October 15, 2015, news outlets reported that Senator McCaskill condemned Valeant's response to her letter, stating: "It appears obvious to me that Valeant has been anything but responsive or transparent—it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

195.    In response to the partial disclosures on October 14 and 15, 2015, the price of Valeant stock dropped by 4.75%, from a close of $177 per share on October 14, 2015, to a close of $168 per share on October 15, 2015, on elevated trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 1.7%; the 6.375% Notes declined 1.2%; the 6.75% Notes due 2018 declined 0.4%; and the 7.5% Notes declined 0.4%.

196.    On October 19, 2015, Valeant's control over a secret network of pharmacies began to come to light. Early that morning, Bill Ackman sent an email to Laurie Little, Valeant's Senior Vice President, Investor Relations, and Pearson regarding a Southern Investigating Reporting Foundation report on Valeant describing the connection between Valeant and Philidor. Little responded, "We knew it was coming and will address on today's call."

197.    The same day, as discussed in ¶¶ 157-65 above, Valeant issued a press release announcing its 3Q15 financial results and hosted a conference call. Pearson, Rosiello, and Kellen hosted the call using a prepared slide presentation. Pearson said he wanted to address "the turmoil over the past few weeks from both governmental and media scrutiny." The Company made limited disclosures, such as confirming its relationship with Philidor, the option to acquire Philidor, and that it had been consolidating Philidor's financial results with its own. Valeant also effectively conceded that its business strategy was neither sustainable nor less risky by disclosing it would rely less on acquisitions and more on R&D. Pearson added that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products."

198.    Valeant further disclosed that it nearly doubled its R&D spending of $56 million in 1Q15 to $102 million in 3Q15 and that "internal R&D will become more of a focus,"

signaling the unsustainable nature of its business strategy and its illusory lower costs and higher profits.

199.    Pearson also disclosed that price accounted for approximately 60% of Valeant's growth in 2014 and 2015. Valeant stated in the accompanying slide presentation that 85 of the Company's 156 U.S.-branded Pharma products had an average price increase of 36%. With respect to the "Neuro and Other" portfolio, Valeant further disclosed that the year-to-date volume had declined by 7% but the net realized price had increased by 30%. Pearson repeated during the call that the Company was "seriously considering spinning off or selling" the "Neuro and Other portfolio, which is dependent on price," and that "internal R&D will become more of a focus."

200.    Pearson refused to discuss the subpoenas Valeant had received from federal prosecutors (*see* ¶ 193), stating "[w]e will not be answering questions." Regarding the government inquiries on price gouging, he stated:

> As you all know, Valeant has responded to Senator McCaskill, and addressed her questions regarding Nitropress and Isuprel. In a letter to her last Wednesday, we discussed . . . the analysis and reasons underlying Valeant's pricing decision, and Valeant's programs designed to improve patient access, among other topics. We also noted that we are beginning an outreach to hospitals where the impact of a price change was significantly greater than average.

201.    When asked what percentage of U.S.-branded prescription business flowed through "alternative fulfillment" and "how much of that is Philidor," Pearson stated:

> It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin, and some of the other orphan drugs. For certain products it's quite large. For Jublia it's probably 15%. For a lot of other dermatologies it's much less. I'm sorry, I can't - it's significant but it's - I don't know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe. Tanya [Carro]'s nodding probably closer to 10%.

202.   After the market closed on October 19, 2015, *The New York Times* published an article titled "Drug Makers Sidestep Barriers on Pricing," discussing how Philidor's application for a license in California had been rejected because it had concealed its owners. The *Times* reported that Valeant used Philidor to "keep the health system paying for high-priced drugs" and to keep prices high for its dermatology products, quoting a Florida dermatologist as stating that Valeant's program was designed to buffer physicians and insurers from complaints about high prices. Discussing Philidor, the article stated, in part:

> Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports.
>
> * * *
>
> Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by . . . Valeant are for common ailments like arthritis pain, acne, and toenail fungus. What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs.

203.   In response to the partial disclosures on October 19, 2015, the price of Valeant stock declined by nearly 8%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume. The following day, Valeant shares fell an additional 10% to close at $146 per share on October 20, 2015, also on unusually high trading volume. The total stock price decline over that two-day period was over 17%, or $30 per share. Additionally, from the close on October 16 to the close on October 20, 2015, the prices of certain Valeant notes declined. For example, (1) from the close on October 16 to the close on October 19, 2015, the 6.75% Notes due 2018 declined 0.09%; and (2) from the close on October 19 to the close on October 20, 2015, the 6.125% Notes

declined 1.56%; the 6.375% Notes declined 0.79%; and the 6.75% Notes due 2018 declined 0.03%.

204.    On October 21, 2015, Citron Research published a report titled "Valeant: Could this be the Pharmaceutical Enron?," questioning the propriety of Valeant's accounting and prior disclosures. The report asked "**Why** would Valeant, a major **big cap pharma**, a **darling** of the hedge fund crowd . . . be secretly maneuvering to buy a little known pharmacy [Philidor] with a dubious ownership structure," and inquired as to why Philidor was "NEVER disclosed in any prior company disclosure?" The report asserted Valeant was using a network of mail-order pharmacies under its control to prop up sales and keep patients and their insurance companies from switching to less costly generics. Citron also questioned whether Valeant's revenues were inflated through Philidor.

205.    The Citron report also linked Philidor to other pharmacies through shared phone numbers, identical privacy notices, a shared facsimile number, and shared websites. Citron claimed "it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies," which included West Wilshire, SafeRx, and Orbit. The report also provided investors with details of the R&O lawsuit, noting Valeant resembled a "house of cards" and could be "Enron part Deux."  After Citron's report was published, trading in Valeant shares was temporarily halted because of the rapid decline in their price.

206.    In response to the partial disclosures on October 21, 2015, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015 to a close of $118 per share on October 21, 2015, on extraordinary trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined

7.9%; the 6.375% Notes declined 6%; the 6.75% Notes due 2018 declined 7%; and the 7.5% Notes declined 8.6%.

207.   Philidor then issued a press release after trading closed on October 21, 2015, disclosing that it had a contractual relationship with "affiliated pharmacies," including R&O, and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

208.   The following day, October 22, 2015, BMO Capital Markets Corp. stated it "cannot defend the specialty Pharmacy structure" Valeant was using and downgraded the shares to "market perform." BMO added: "We've been strong, vocal Valeant bulls," but "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable." The same day, a *Bloomberg* article titled "Valeant Still Has Explaining to Do, Citron Research's Left Says," reported on Valeant's option to buy Philidor and noted it was "a relationship other [drug] companies don't appear to have" with pharmacies. The article noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because it was "perceived" as a conflict of interest.

209.   Following Philidor's October 21, 2015 press release and the additional partial disclosures on October 22, 2015, as the market continued to digest the negative news regarding Valeant, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109 per share on unusually high trading volume. The total stock price decline over the period October 21-22, 2015 was over 25%, or $36 per share. Additionally, from the close on October 21 to the close on October 22, 2015, the prices of certain Valeant notes declined. For

example, the 6.125% Notes declined 1.8%; the 6.375% Notes declined 4.8%; and the 6.75% Notes due 2018 declined 1.8%.

210.   Revelations of Valeant's misconduct continued as Philidor employees came forward disclosing the improper practices employed by Philidor. On Sunday, October 25, 2015, *The Wall Street Journal* reported it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products." A former employee interviewed by *The Wall Street Journal* noted the Valeant employees' "real identities were well known to the other Philidor employees."

211.   That night, Ackman forwarded a media article to Pearson, Schiller, Rosiello, Ingram, and Little reporting that Pearson's explanation that Valeant did not disclose Philidor because it was a competitive advantage "comes up short." The article noted that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise. And since materiality is a qualitative, not a quantitative, concept the company shouldn't try to stonewall." Ackman suggested the Company admit "some mistakes were made." As an example, Ackman wrote "it a mistake not to disclose Philador [sic]? In retrospect, it certainly appears to have been a mistake as the lack of disclosure made the company a potential target for a short attack which implied the company was hiding something." Ackman observed that "the lack of disclosure on Philidor was a big surprise and raised concerns among shareholders." He suggested they "explain whether or not the board, audit committee, auditors understood and agreed with the accounting, strategy, and disclosure of this business," adding "[i]nvestors fear fraud."

212.     On October 26, 2015, Valeant filed its 3Q15 10-Q, which included disclosures relating to Philidor, including that Valeant had the "power to direct Philidor's activities." The 10-Q also revealed that Valeant established a special "ad hoc" committee of the Board to investigate Valeant's relationship with Philidor, to be led by Ingram, the Company's lead outside director, and to include Provencio, chairman of the Audit and Risk Committee, director Colleen Goggins, and Mason Morfit, President of ValueAct Capital (one of Valeant's largest shareholders), who had been added to the Valeant Board that morning and immediately placed on the ad hoc committee.

213.     Also that day, Valeant hosted a conference call that included a presentation stating, among other things:

- "44% of Jublia revenue flowed through Philidor in Q3 2015";

- "we maintain regular communication, have a joint steering committee, have rights (and have utilized them) to approve key positions (*e.g.*, in-house lawyer, chief compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit program for 2015";

- "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, Right to require hires for certain positions, Substantial information rights, Covenants respecting Philidor's compliance with all applicable laws"; and

- in a section addressing Valeant's "Management Rights" over Philidor, "Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

214.     On the conference call, Rosiello stated: "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014." And Carro admitted "Valeant reviews the financials of the Philidor network pharmacies on a regular basis."

215.   Shortly after the call, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."

216.   In response to the partial disclosures on October 25 and 26, 2015, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday, October 23, 2015 to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.375% Notes declined 1.9%; the 6.75% Notes due 2018 declined 1.2%; and the 7.5% Notes declined 1%.

217.   On October 27, 2015, Ackman emailed Pearson and Schiller, stating "I don't think you are handling this correctly and the company is at risk of getting into a death spiral as a result." In another email that day, Ackman wrote to Ingram, Pearson, Schiller, Morfit, and Little regarding *The New York Times* article by Joe Nocera on whether Valeant was the "Next Enron?," in which the reporter wrote "Valeant . . . is a sleazy company." Ackman stated in his email, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short." He warned "[y]our reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis." Ackman criticized Pearson for ending the last conference call abruptly: "When Mike said that you were running out of time on the call, he was right in that the company is running out of time to save itself. When shareholders hear that management doesn't have time to address their concerns, they assume the worst. There is no amount of time that should [be] spared addressing shareholders [sic] concerns." Ackman noted it took a "short seller to bring Philador [sic] to light and that has destroyed managements [sic] compact with shareholders."

218.    In his October 27, 2015 email to Pearson and Schiller, Ackman advised, "I strongly recommend you immediately hold a conference call to address every remaining question from shareholders," of "unlimited duration." Ackman pleaded with the executives to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are." Ackman noted the business risks, including, "Valeant has become toxic. Doctors will stop prescribing your products," and "[r]egulators around the world will start investigating and competing to find problems with every element of your business." He further stated: "The only people that need scripts and limited questions are crooks. Joe Nocera is right. You look like Enron." He added, "You should assume that the truth will come out eventually so there is zero downside to having it out now," and "If mistakes have been made, admit them immediately and apologize." Ackman closed the email by stating:

> You have previously made the mistake of waiting while Rome was burning. There is now a conflagration. It takes no time to prepare for a conference call to tell the truth. The time to do it is today. We are on the brink of tragedy. Please do the right thing.

219.    Pearson did not follow Ackman's advice, but the truth nonetheless continued to emerge. After the market closed on October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim—to essentially shop around for one that would be accepted."

220.    On October 29, 2015, *Bloomberg Businessweek* reported additional accounts by former Philidor employees of the improper tactics by Philidor. The article disclosed that:

- "to fill more prescriptions with Valeant products instead of generics . . . [w]orkers at . . . Philidor . . . were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs—not less expensive generic versions—be dispensed, the former employees said";

- "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels . . . is rejected"; and

- an October 2014 employee manual noted "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."

221.    Later that day, while the market was still open, reports disclosed that CVS Caremark (one of the three largest PBMs in the United States) terminated its relationship with Philidor after an audit of Philidor's practices, citing "noncompliance" with its provider agreement.

222.    In response to the partial disclosures on October 28 and 29, 2015, the price of Valeant stock dropped nearly 5%, from a close of $117 per share on October 28, 2015 to a close of $111 per share on October 29, 2015, on unusually high trading volume. Additionally, during that period the prices of certain Valeant notes declined; for example, the 6.375% Notes declined 0.5%.

223.    After the market closed on October 29, 2015, Express Scripts and UnitedHealth's OptumRx, the other two largest PBMs, similarly announced they had terminated their relationships with Philidor. Thus, in the same day, the three largest PBMs in the country announced they would no longer pay for medication dispensed by Philidor. And on October 30, 2015, just after underscoring the purported benefits and independence of Philidor, Valeant announced before the market opened that Philidor would be shutting down as soon as possible.

224.    In response to the partial disclosures on October 29 and 30, 2015, Valeant shares fell by nearly 16%, from a close of $111 per share on October 29, 2015 to a close of $93 per share on October 30, 2015, on unusually high trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.375% Notes declined 1.9%; the 6.75% Notes due 2018 declined 1%; and the 7.5% Notes declined 2.6%.

### B. Disclosures in November and December 2015

225. On November 4, 2015, it was reported that the Senate Aging Committee formally launched a probe into Valeant's price increases for three drugs. On the same day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, disclosing that just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy; that revelation further called into question the viability of the Company's recently issued financial guidance. And after the market closed that day, *The Wall Street Journal* reported that Ackman told Valeant's lead director, Ingram, that Pearson might need to leave Valeant and that Ackman was considering liquidating his hedge fund's entire $3.8 billion investment in the Company. *The Wall Street Journal* article further noted that Ackman had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

226. In response to the partial disclosures on November 4, 2015, the price of Valeant stock dropped by approximately 6%, from a close of $97 per share on November 3, 2015 to a close of $91 per share on November 4, 2015, on elevated trading volume. Valeant shares continued to decline the following day, falling by more than 14%, to close at $78 per share on November 5, 2015, on extraordinary trading volume. The total stock price decline over that two-day period was 19.5%, or $19 per share. Additionally, from the close on November 3 to the close on November 5, 2015, the prices of certain Valeant notes declined. For example, (1) from the close on November 3 to the close on November 4, 2015, the 6.125% Notes declined 1.96%; the 6.375% Notes declined 0.83%; and the 6.75% Notes due 2018 declined 2.3%; and (2) from the close on November 4 to the close on November 5, 2015, the 6.125% Notes declined 1.56%; the 6.375% Notes declined 2.8%; and the 6.75% Notes due 2018 declined 1.2%.

227.    On November 10, 2015, Valeant hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you." Pearson, Rosiello, Carro, and Kellen participated on Valeant's behalf. Pearson stated, "As of last week, Philidor has stopped adjudicating claims. . . . Philidor has committed to cease operations by January 30, 2016 at the latest."

228.    Pearson also began to disclose the negative financial impact the closing of Philidor and the government inquiries into its practices were having, stating in relevant part:

> In the very short term, disruption in our dermatology business will be significant. Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week.
>
> Turning to Neuro, we are also seeing some short-term pressure in our Neuro business, in particular with respect to Nitropress and Isuprel, given all the publicity around those two drugs. We're working with our large customers and providing direct discounts to protect volume.

229.    Despite having just raised guidance less than a month before (on October 19, 2015), Pearson suggested it would be withdrawn and lowered:

> In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship with Philidor. Specifically, the downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology RX. Obviously, what has happened will impact Q4. We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

230.    Pearson was asked about the impact the Company would see in 4Q15 in the dermatology division, and responded:

> So, again, based on the data we have, we've not seen volume declines. It's largely the value of the average selling price for a script. Now, I would not be shocked to see some volume declines over the next few weeks.

In fact, I would expect that. But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

231.    Additionally, in response to an analyst's question regarding pricing scrutiny, Pearson stated "if we're viewed as aggressive, we're going to have to listen to that." He acknowledged "the past few weeks have been a painful learning experience for me personally" and stated "[t]he other things I'm dedicated to doing going forward is listening more to our patients, our partners, and our critics."

232.    In response to those partial disclosures on November 10, 2015, the price of Valeant stock dropped 2%, from a close of $85 per share on November 9, 2015 to a close of $83 per share on November 10, 2015, on unusually high trading volume. Additionally, during that period the prices of certain Valeant notes declined.

233.    Additionally, after the market closed on November 10, 2015, it was reported that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay Philidor employees in order to obtain information regarding Valeant's practices. And on November 11, 2015, *Bloomberg* reported that Valeant creditors were "spooked by possibility of revenue squeeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." The article reported that according to one creditor, "The Big question is: What is the true cash-flow generation nature of the company? Will it be materially different?" The report further noted Valeant's dermatology and neurology business accounted for 24 percent of company revenue, which Pearson stated would be "significantly" disrupted. Also that day, Nomura analysts cut their Valeant price target. Additionally, on November 12, 2015, *Bloomberg* released another article regarding Valeant's relationship with Philidor and media reports recounted how numerous analysts had lowered their price targets for the Company.

234.    In response to those partial disclosures, Valeant's stock price dropped an additional 6.5%, to close at $73 per share. The total stock price decline from November 10 through November 12, 2015 was over 13%, or $11 per share. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 2.71%; the 6.375% Notes declined 1.39%; the 6.75% Notes due 2018 declined 1.36%; and the 7.5% Notes declined 1.63%.

235.    On November 16, 2015, *Bloomberg* reported that Congressman Elijah Cummings wrote to Pearson requesting that he make Valeant employees Gary Tanner, Bijal Patel, and Alison Pritchett available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations." Congressman Cummings also asked for contact information for Laizer Kornwasser, who had recently left the Company. After the market closed that day, *The Washington Post* published an article titled "House Committee to hold hearing on prescription drug pricing," reporting that the House Oversight Committee would hold a formal hearing in early 2016 focusing on prescription drug pricing and that the Committee had reached out to Valeant to gather information. The article also stated members of the House Oversight Committee were calling for Valeant executives to testify at the hearing.

236.    In response to the partial disclosures on November 16, 2015, the price of Valeant stock dropped by nearly 3%, from a close of $75 per share on November 13, 2015 to a close of $73 per share on November 16, 2015, on unusually high volume, and continued to decline on November 17, 2015, dropping an additional 4% to close at $70, on high trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 0.45%; the 6.75% Notes due 2018 declined 0.47%; and the 7.5% Notes

declined 1.1%. Further, for example, from the close on November 16 to the close on November 17, 2015, the 6.125% Notes declined 0.30%; the 6.375% Notes declined 0.83%; the 6.75% Notes due 2018 declined 0.2%; and the 7.5% Notes declined 0.21%.

237.    On December 15, 2015, Valeant issued a press release announcing it had entered into a deal with Walgreens to distribute Valeant products, which included 10% price reductions for its branded prescription-based dermatological and ophthalmological products.

238.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it had issued on October 19, 2015. Valeant issued new 4Q15 revenue guidance of $2.7 billion-$2.8 billion (a reduction of approximately $600 million from $3.25 billion-$3.45 billion) and Cash EPS guidance of $2.55-$2.65 (a reduction of approximately $1.50 from $4.00-$4.20). Valeant also issued new 2015 full year revenue guidance of $10.4 billion-$10.5 billion (a reduction of approximately $700 million from $11.0 billion-$11.2 billion) and new 2015 Cash EPS guidance of $10.23-$10.33 (an approximately $1.50 reduction from $11.67-$11.87). Finally, Defendants issued new 2016 EBITDA guidance of $6.9 billion-$7.1 billion (a reduction of approximately $500 million from $7.5 billion).

239.    On December 16, 2015, an analyst for Piper Jaffray reported that Valeant was not "well positioned for significant [price/earnings] recovery anytime soon given the credibility gap associated with senior management." The next day, Mizuho Securities USA cut its rating on Valeant stock to "neutral" from "buy," pointing to a lack of clarity regarding Valeant's agreement with Walgreens and stating that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist." During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade. On that news, the price of Valeant

stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015. Additionally, during that period the prices of certain Valeant notes declined; for example, the 6.125% Notes declined 0.83%.

### C.      Disclosures in February and March 2016

240.     On February 19, 2016, a Wells Fargo report by analyst David Maris, which provided a detailed analysis of Valeant, drew significant media attention. The media noted Maris had identified inconsistencies with regard to Defendants' disclosures concerning Philidor's impact on the business. Specifically, Maris found that Valeant initially claimed Philidor accounted for 7% of sales, yet lowered 4Q15 revenue guidance by 17%-19% (from $3.25 billion-$3.45 billion to $2.7 billion-$2.8 billion) and EPS guidance by nearly 37% (from $4.00-$4.20 to $2.55-$2.65). Maris commented "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS." Maris added that at approximately 7% of revenue, Philidor would have represented approximately $227.8 million in revenue for 4Q15, yet guidance was lowered by $526.5 million. He concluded "the new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact, as described by Valeant."

241.     Further, according to media reports, Maris stated "we believe investors are likely questioning the judgment and decision making of [the] management team and board," adding "corporate cultures . . . are difficult to change without management and board changes." Maris noted "the slide in Valeant's shares is directly related to decisions that the board and management have made," including "the board review and approval of a relationship with Philidor, which later caused a significant decline in shareholder value and corporate reputation."

242.     Media reports also recounted that Maris discussed the reduced financial outlook for Valeant, noting "management has said that it is not planning to complete any acquisitions in 2016, nor is it planning to raise prices excessively," and concluding "this will pose significant risk for a company that was dependent on both." He further commented "the model of cutting R&D and spending, and dramatically raising prices, in pursuit of higher and higher EPS to fuel a roll-up strategy built on earnings accretion for deals is shortsighted, as often the cuts undermine the longer-term prospects of the business."

243.     Finally, according to media reports, Maris identified how Valeant's accounting was misaligned with Valeant's purported performance. He said "receivables growth has outstripped sales growth over the past several years" and noted that a screening tool it uses "to predict the likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category," adding that when "receivables are increasing faster than revenue, it can often indicate that customers are hesitant to pay for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue." Maris further stated that "gross-to-net revenue adjustments" in 2012 were 19.1% of gross revenues but had steadily increased to 41.1% of gross revenues by 3Q15, and that "Valeant suggests the reason for the increasing provision is growing returns, rebates, and co-pay assistance programs related to select dermatology products."

244.     In response to the partial disclosures on February 19, 2016, the price of Valeant stock dropped by nearly 10%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 0.23%; the 6.75% Notes due 2018 declined 0.32%; and the 7.5% Notes declined 0.88%.

245.    On February 22, 2016, Maris released an updated note regarding Valeant that included two additional valuation models and a $62 price target, and CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less-expensive generic drug.

246.    Also that day, *Market Watch* reported that Valeant "likely needs to restate some of its previous financial results based on the findings of an internal investigation into its business, according to people familiar with the matter." *Market Watch* noted the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

247.    That evening, Valeant issued a release confirming its financial restatement. In the release, Valeant admitted "the Company has preliminarily identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor." The release stated the Company "currently believes that approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10."

248.    Valeant also revealed internal control problems, stating that the Company would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee . . . and the Company's ongoing assessment of the impact on financial reporting and internal controls." Schiller assured investors that the Company was "committed to improving reporting procedures, internal controls and transparency for our investors" and "[w]e

have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."

249.    In response to the partial disclosures on February 22, 2016, the price of Valeant stock dropped by over 10%, from a close of $84 per share on Friday, February 19, 2016 to a close of $75 per share on Monday, February 22, 2016, on unusually high trading volume. Valeant shares continued falling in after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share. Additionally, from the close on February 19 to the close on February 22, 2016, the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 7.83%; the 6.375% Notes declined 1.27%; the 6.75% Notes due 2018 declined 1%; and the 7.5% Notes declined 1.15%.

250.    On Sunday, February 28, 2016, Valeant issued a press release announcing that Pearson was returning from his medical leave but that the Company was separating the role of CEO and Chairman of the Board, naming Ingram as Chairman. The release further disclosed that "[i]n the interim, the Company is withdrawing its prior financial guidance," adding that "[a]s previously announced, the Company will delay filing its 2015 10-K pending completion of the review of certain accounting matters by the Ad Hoc Committee" and "the Company's ongoing assessment of the impact on financial reporting and internal controls." Pearson was quoted as admitting that "I realize that recent events are disappointing to everyone" and that among his priorities would be "improving Valeant's reporting procedures, internal controls and transparency." Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016. Wells Fargo analyst Maris wrote in a research note, for instance, that he was "concerned by Pearson's return" and that "[a]s of this writing, Valeant has lost more market value than it has created." Later that day, *Bloomberg* reported that Pearson would hold a

call with sell-side analysts that day, despite canceling the public earnings call scheduled for earlier in the day. Additionally, Moody's placed Valeant ratings on review for potential downgrade, reflecting concerns that Valeant's underlying operating performance was weaker than Moody's previous expectations, potentially impeding the Company's deleveraging plans. Then, within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, reports surfaced that Valeant had cancelled its non-public analyst call "due to media interest." As the day progressed, reports surfaced, and Valeant ultimately confirmed, that the Company was under investigation by the SEC and had received a subpoena from the SEC during 4Q15.

251. In response to the partial disclosures on February 28 and 29, 2016, the price of Valeant stock dropped by more than 18%, from a close of $80 per share on Friday, February 26, 2016 to a close of $65 per share on Monday, February 29, 2016, on unusually high trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 6.85%; the 6.375% Notes declined 4.25%; the 6.75% Notes due 2018 declined 3.6%; and the 7.5% Notes declined 6.70%.

252. On March 15, 2016, Valeant reduced its financial guidance for 2016 and provided unaudited financial information regarding its 4Q15 performance. With regard to 2016 guidance, Valeant lowered revenue guidance to $11 billion-$11.2 billion (a reduction of approximately $1.5 billion and 12% from the full year 2016 $12.5 billion-$12.7 billion guidance given on December 16, 2015), Cash EPS guidance to $9.50-$10.50 (a reduction of approximately $3.50 from its prior $13.25-$13.75 guidance), and full year 2016 EBITDA guidance to $5.6 billion-$5.8 billion (an approximately $1.3 billion reduction from its prior $6.9 billion-$7.1 billion guidance). The Company blamed "reduced revenue assumptions for certain businesses, new

managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."

253.    The Company hosted a conference call that same day. During the call, Rosiello stated Valeant's first quarter results were below guidance in part due to "realizing a slower- than-expected rebound in dermatology," and Pearson added that "increases in rebates are due to more competitive pressure in response to our store price increases for our late life cycle products."  In a press release also issued that day, Valeant disclosed $51.3 million in "wind down costs" for Philidor, which included writedowns of fixed assets and bad-debt expenses during the "wind down period November 1, 2015 through December 31, 2015." The Company also disclosed a "$79.0 million impairment charge related to Philidor Rx Services."

254.    During the conference call, Pearson explained why the guidance was being lowered. In particular, he cited "higher-than-expected inventory reductions that transition from Philidor to Walgreens and the cancellation of almost all price increases." Pearson added that "any future price increases will be more modest and in line with industry practices and managed-care contracts," and noted "[w]e have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia." He further revealed that the Company had already committed to reducing pricing on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on WAC and will impact and will be taken across all channels, not just Walgreens."

255.    During the conference call, Defendants further admitted that even the Company's release from that morning was inaccurate in reporting forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the number should have been only $6.0 billion.

256.     Additionally, during that call, an analyst noted "the fact that management needs to rebuild credibility with investors" and that the guidance was "lowered far more than any investor anticipated." The analyst asked "how can we be confident in what you're saying today about the business, given that you were positive in December and January?" Pearson responded, in part, "we have to earn back the credibility."[11]

257.     Also on March 15, 2016, Moody's further downgraded Valeant's credit ratings, as well as those of its subsidiaries.

258.     In response to the partial disclosures on March 15, 2016, the price of Valeant stock fell by more than 50%, from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extremely high trading volume. Additionally, during that period the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 12.28%; the 6.375% Notes declined 11.17%; and the 6.75% Notes due 2018 declined 7.6%.

259.     On March 21, 2016, Valeant filed a Form 8-K announcing the restatement of its prior financial statements. The Company disclosed that in light of the ad hoc committee's review of recent allegations and related matters it was determined that "approximately $58 million in net revenues relating to sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor." Valeant therefore disclosed that the Company's last four financial statements, the 2014 10-K, and the 10-Qs for the first, second, and third quarters of 2015, along with PricewaterhouseCooper's audit report on the 2014 10-K, should no longer be relied on.

260.     Specifically, the ad hoc committee determined that the Company's revenue recognition "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to

---

[11] In a publicly disclosed message to Valeant employees the next day, Pearson reiterated that "[r]estoring the public's confidence will take time."

Philidor)" before the Company's purchase option agreement with Philidor was improper. Instead, "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record[ed] revenue when Philidor dispensed the products to patients) prior to entry into the option agreement." As a result, the Company was no longer able to record revenues for shipments to Philidor and could only record revenues upon shipment to the patient. The press release further disclosed:

> Management, in consultation with the [ad hoc] committee, has concluded that one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

261.    The Company further admitted:

> The ***improper conduct*** of the company's former chief financial officer [Schiller] and former corporate controller [Carro], which resulted in the provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results. In addition, as part of this assessment of internal control over financial reporting, the company has determined that the ***tone at the top of the organization*** and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition.

The Company further stated it would begin searching for a new CEO to replace Pearson, who would continue to serve as CEO and a director until his replacement was appointed.

262.    On March 22, 2016, *Business Insider*, in an article titled "Bill Ackman's Plan to Fix Valeant Is Doomed," attempted to quantify the impact of the change in business strategy from Valeant's non-traditional approach to that of a traditional pharmaceutical company. The article noted that without price hikes, "Valeant would lose 10% of its revenue." The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D

spending to 13% instead of 3% that "Valeant would be losing money. *A lot of money.*" (Emphasis in original.) The article further noted that, according to an analysis conducted by Bloomberg, "[i]f Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12-month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53. Ebit could have dropped to $606 million from $2.5 billion . . .Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

### D.    Disclosures from April to August 2016

263.    On April 9, 2016, *The New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction," which noted "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February." Citing interviews with former employees, analysts, investors, and doctors, the article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor. The article explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price." But once Valeant acquired the drug, it doubled the price to $800, causing payors to reconsider their coverage. Valeant also terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

264.    On April 29, 2016, Valeant released its 2015 10-K, which confirmed the financial restatement and the Company's material weaknesses. Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.

265.    On May 3, 2016, Valeant announced the appointment of Joseph C. Papa as its CEO and Chairman of the Board, reuniting the roles it recently had separated. Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference. While answering questions from investors and analysts, Papa described Valeant as "a great turnaround

opportunity" and discussed a number of the challenges he inherited. Papa acknowledged that with Philidor "clearly we had some question marks," "there were some pricing mistakes that were made," and "some transparency things that [could be] improve[d] on at Valeant." Regarding internal controls, Papa recognized "there are some functions that we need to put some additional [] controls" and "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities." To that end, Papa disclosed that the Company "just recently hired a new Controller."

266.    On June 7, 2016, Valeant made additional disclosures regarding the financial impact of shutting down its captive pharmacy network, restricting the Company's ability to price gouge and engage in deceptive practices.  That day, Valeant filed its 1Q16 10-Q, issued a press release, and hosted a conference call regarding the Company's long-awaited 1Q16 financial results, which had been delayed by several months. Valeant disclosed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance again to total revenue of $9.9 billion-$10.1 billion (down from $11 billion-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80 billion-$4.95 billion (down from $5.6 billion-$5.8 billion). During Valeant's conference call that day, Rosiello stated "[t]he base business in Q1 declined by $289 million, driven by dermatology . . . and the transition to Walgreens."

267.    Further revealing the detrimental effect that the loss of Philidor was having on Valeant's pricing, volume, and drug refills, Rosiello added during the call:

> Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling prices] declining post launch. Overall volume challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship, as well as the negative external narrative and some internal disruptions . . . .

268.    Papa added that the "vast majority" of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall." During the question-and-answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability were suffering as a result its cessation of price gouging and deceptive practices and the termination of its relationship with Philidor:

> The issue is that there is a percentage of the business where the average selling price is significantly below what we had previously expected as we put the program together. And in fact, in some places that average selling price is negative and by that [it] means, every time a prescription goes out the door we're taping dollar bills to that prescription as it goes out the door. That's something that we have to get fixed.

269.    In response to the partial disclosures on June 7, 2016, which further revealed the extent to which Valeant relied on Philidor to boost prescription drug sales, refills, and prices during much of the Relevant Period, the price of Valeant stock dropped by nearly 15% to close at $24 that day, on unusually high trading volume. Additionally, from the close on June 6 to the close on June 7, 2016, the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 0.90%; the 6.375% Notes declined 0.56%; the 6.75% Notes due 2018 declined 0.77%; and the 7.5% Notes declined 1.37%.

270.    On July 31, 2016, *The New York Times* published an article titled "How Valeant Cashed In Twice on Higher Drug Prices," which detailed Valeant's use of "price appreciation credits" to inflate the Company's revenues. The article explained that the credits, which come about when a drug company increases the cost that its wholesalers must pay for a product they have contracted to distribute, were "an obscure but vital source of cash to Valeant that is directly linked to its pricing practices." As reported by *The New York Times*, "[n]ow that those practices are under scrutiny, the money Valeant receives from these credits is likely to decline substantially or disappear outright," noting the "unique" and "outsize contributions" of the

106

credits to Valeant's cash flows. "In recent periods, they have equaled one-fifth or more of Valeant's operating cash flow," the article emphasized, based on the Company's reported financials.

271.  On August 9, 2016, Valeant issued a release and hosted a conference call regarding the Company's 2Q16 financial results. In the release, Valeant disclosed a GAAP loss per share of ($0.88) for 2Q16 and a drop in revenue of 11.4%, with the Company blaming the slow recovery in its dermatology division, which suffered greatly from Philidor's closing. The release disclosed that Valeant's dermatology revenue dropped 55% compared to 2Q15, with Solodyn and Jublia sales down 74% and 69%, respectively, year-over-year. The two Valeant drugs singled out by Congress at the start of its probes, the heart drugs Nitropress and Isuprel, experienced year-over-year revenue declines of 46% and 19%, respectively. In Valeant's conference call that day, Papa stated that "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan." Additionally, the Company cited lower price appreciation credits as one of the reasons revenues declined 14% in Developed Markets.

272.  Also on August 9, 2016, in an article titled "Valeant Begins to Look Like A Normal Drug Company, But With Way Too Much Debt," *Forbes* reported on analysis by Wells Fargo analyst Maris. Further demonstrating the challenges facing the Company following the closure of its secret pharmacy network and the cessation of its deceptive practices, *Forbes* noted that by Maris's calculations, "Papa will have to deliver a 55% sequential increase in adjusted EPS and a 30% increase in adjusted EBITDA in the second half of 2016 to meet guidance" and that "Xifaxan remains off pace to hit $1 billion in 2016 sales, a previous Valeant target." Quoting

Maris, *Forbes* added: "If Papa falls short in coming quarters, it is likely many will see the company's new reign as 'just new paint on the same old shed' . . . ."

273.    After the market closed on August 10, 2016, *The Wall Street Journal* reported that Valeant was under criminal investigation by the DOJ regarding whether it defrauded insurers by concealing its relationship to Philidor and for a variety of other deceptive business practices. According to the *Journal* article, which was quickly picked up by a variety of other media outlets, federal prosecutors in the U.S. attorney's office in Manhattan were investigating possible mail and wire fraud violations based on whether Valeant "defrauded insurers by shrouding its ties to a mail-order pharmacy [Philidor] that boosted sales of its drugs," and for deceptive business practices used to sell Valeant drugs, such as rebates and other compensation provided to patients. According to sources interviewed by the *Journal* familiar with the matter, "[p]rosecutors are investigating not only the level of control Valeant exerted over Philidor's business, but the extent of the ties, including Valeant's role in Philidor's growth." The *Journal* cited those sources as stating "the probe is expected to be the most serious Valeant currently faces, and could lead to criminal charges against former Philidor executives and Valeant as a company." The article quoted a statement by Valeant that it "has been cooperating and continues to cooperate with the ongoing Southern District of New York investigation."

274.    In response to that news, which further revealed the enormous risks presented by Valeant's secret pharmacy network and other undisclosed business practices, the price of Valeant stock declined by over 10% to close at $24.49 on August 11, 2016, on unusually high trading volume. Additionally, from the close on August 10 to the close on August 11, 2016, the prices of certain Valeant notes declined. For example, the 6.125% Notes declined 2%; the 6.375% Notes declined 1.38%; and the 7.5% Notes declined 1.04%.

275.    The disclosures detailed in ¶¶ 185-274 above revealed the truth regarding Defendants' representations to investors, and accordingly caused the prices of Valeant stock and Notes to drop significantly, resulting in losses to Plaintiffs and other investors. Further, the timing and magnitude of the price declines discussed above negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct, as illustrated by the following chart:



## X.    PLAINTIFFS' RELIANCE

### A.    Plaintiffs Are Entitled to a Presumption of Reliance.

276.    A presumption of reliance is appropriate under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because this action involves Defendants' omissions of material adverse information regarding Valeant's business operations, financial results, and prospects—information Defendants were obligated to disclose. Accordingly, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be

material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' statements and omissions detailed above, that requirement is satisfied here.

277.     A presumption of reliance is also appropriate under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, Valeant stock and notes traded at artificially inflated prices during the Relevant Period on markets that were open, well-developed, and efficient at all times. Plaintiffs purchased Valeant securities relying on the integrity of the market prices of those securities and public information relating to Valeant, and have been damaged as a result of Defendants' false or misleading statements or omissions.

278.     At all relevant times, the markets for Valeant securities were efficient, for the following reasons, among others:

      a.    Valeant stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b.    Valeant debt securities, including its senior notes, were widely distributed and actively traded, with trade information available through the Trade Reporting and Compliance Engine;

      c.    As a regulated issuer, Valeant filed periodic public reports with the SEC and the NYSE;

      d.    Valeant securities, including its debt securities, were rated by nationally recognized credit rating agencies, including Moody's and Standard & Poor's Rating Services;

      e.    Valeant regularly communicated with public investors via established market communication mechanisms, including regular disseminations of releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      f.    Valeant was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, and those reports were publicly available and entered the public marketplace.

279. As a result of the foregoing, the market for Valeant securities promptly digested current information regarding Valeant from all publicly available sources and reflected that information in the price of Valeant securities.

280. At the times they purchased Valeant securities, Plaintiffs lacked knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not reasonably have discovered those facts.

**B.      Plaintiffs Directly Relied on Defendants' Misstatements or Omissions.**

281. During the Relevant Period, the Funds' investments were managed by Senzar, which employed an analytical, research-based investment process. Under that process, Senzar investment personnel made decisions for the Funds regarding whether to purchase, sell, or hold Valeant securities.

282. Throughout the Relevant Period, Senzar investment personnel performed rigorous research, including reading and relying on publicly available information concerning Valeant. In deciding whether to purchase, sell, or hold Valeant securities, Senzar investment personnel read and relied on, among other things, (1) Valeant's 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, 3Q14 10-Q, 2014 10-K, 1Q15 10-Q, 2Q15 10-Q, and 3Q15 10-Q; and (2) Valeant press releases and earnings conference calls, including slide decks used by Valeant executives in connection with those presentations. Senzar investment personnel relied on Defendants' statements within those documents regarding Valeant's acquisitions, earnings, and "organic growth" (including "same store sales" organic growth), including statements regarding revenue from drugs acquired through the Company's acquisition of Salix, in particular Xifaxan.

283. The statements on which Senzar directly relied included:

(a)      Defendants' statement in Valeant's earnings press release for 4Q13 and FY13, issued on February 27, 2014 (and included as an exhibit to a Form 8-K filed by Valeant

that day), that "[s]ame store organic product sales growth was 13%, excluding the impact of the gencricization of the Zovirax franchise, Retin-A Micro and BenzaClin" (*see* App'x at A-2 – A-3);

(b)      Defendants' statements in Valeant's 2Q14 earnings press release, issued on July 31, 2014 (and included as an exhibit to a Form 8-K filed by Valeant that day), that "[e]xcluding the impact of generics, same store sales organic product sales growth was 10%, and pro forma organic product sales growth for Valeant was 11%," and "[a]s mentioned in previous conference calls, we continue to expect a significant acceleration of organic growth in the second half of the year" (*see* App'x at A-4 – A-5);

(c)      Defendants' statement in Valeant's 3Q14 earnings press release, issued on October 20, 2014 (and included as an exhibit to a Form 8-K filed by Valeant that day), that "[t]otal same store sales organic growth was 19%, including impact from generics" (*see* App'x at A-6);

(d)      Defendants' statement in Valeant's earnings press release for 4Q and FY14, issued on February 22, 2015 (and included as an exhibit to a Form 8-K filed by Valeant on February 23, 2015), that "Total Same Store Sales organic growth" was 16% and 13% for 4Q14 and FY14, respectively (*see* App'x at A-8);

(e)      Defendants' statement in Valeant's 1Q15 earnings press release, issued on April 29, 2015 (and included as an exhibit to a Form 8-K filed by Valeant that day), that "Same Store Sales Organic Growth was 15%" (*see* App'x at A-10);

(f)      Defendants' statement in Valeant's 2Q15 earnings press release, issued on July 23, 2015 (and included as an exhibit to a Form 8-K filed by Valeant that day), that "Same Store Sales Organic Growth was 19%," driven by, *inter alia*, "U.S. businesses, driven by the

strength of dermatology, contact lenses, dental and Obagi," as well as Pearson's statement during Valeant's 2Q15 earnings conference call the same day that "[w]e have now delivered four consecutive quarters of more than 15% same-store organic growth" (*see* App'x at A-11); and

(g)     Defendants' reference in Valeant's 3Q15 earnings press release, issued on October 19, 2015 (and included as an exhibit to a Form 8-K filed by Valeant that day), to "[s]ame store sales organic growth of 13%; 5th consecutive quarter of > 10% organic growth, driven by: Continued outperformance of U.S. businesses, particularly dermatology and contact lens" (*see* ¶ 157).

284.     Defendants' false or misleading statements alleged in this Complaint were a substantial factor in Senzar's investment decisions with respect to Valeant securities. The investment personnel responsible for those decisions did not know, and in the exercise of reasonable diligence could not have known, of Defendants' misconduct alleged in this Complaint when deciding that Plaintiffs should purchase, sell, or hold Valeant securities during the Relevant Period.

## XI.    DEFENDANTS ACTED WITH SCIENTER

285.     As detailed above, Defendants participated in an intricate scheme through which they defrauded investors by misstating or failing to disclose material facts regarding Valeant's business operations, financial results, and internal controls. The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed in this Complaint. They were also personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics employed by Philidor by virtue of their frequent meetings, effective control over, and contractual right to review and approve Philidor's records and policies. Additionally, the Individual Defendants had significant motives to engage in the fraudulent conduct.  Other facts demonstrating Defendants' scienter are detailed below.

A.     **The Individual Defendants Played a Critical Role In Valeant's Business Strategy.**

286.    Pearson was the architect of Valeant's business strategy and orchestrated the dramatic price increases and deceptive business practices along with the other Individual Defendants. Pearson implemented the strategies discussed in this Complaint when he became Valeant's CEO, i.e., acquiring existing drugs, cutting R&D, and engaging in price gouging while hiding such practices by intentionally concealing that Valeant's network of captive pharmacies formed the core of the Company's operations. Each of the Individual Defendants designed, implemented, or approved the strategy.

287.    A former Valeant executive told *Forbes* that Pearson "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." According to *Forbes*, Pearson "liked to hire cronies like his former McKinsey partner Robert Rosiello, (now Valeant's chief financial officer)," his "brother-in-law [Robert Brabandt], who was paid $299,000 a year," and "Ryan Weldon, head of Valeant's U.S. dermatology operation," who was the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon. Other members of the Board and executives also had prior ties to Pearson.

288.    Former employees interviewed by *Bloomberg Businessweek* confirmed that Pearson had a hands-on management style and "had his fingers in everything, from operations to making decisions about the salaries of individual employees." *Forbes* also confirmed that Pearson "micromanaged things he deemed important."

289.     Pearson held weekly calls with the leaders of Valeant's business groups on Tuesdays at 11:00 a.m., during which Valeant's senior management would assess the business and address developing issues.

290.    During Valeant's 1Q15 earnings conference call on April 29, 2015, Schiller stated "Mike [Pearson] sets the tone at Valeant," adding, in part:

> I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our relentless focus on building a great Company and on creating shareholder value.
>
> . . . . Valeant's business has never been stronger and its prospects have never been brighter. . . .

291.    Additionally, Valeant documents and sworn testimony, among other things, confirm that the Individual Defendants were directly involved in the business and pricing strategies implemented by Valeant. For example, when Isuprel and Nitropress were acquired, Pearson, Schiller, Kornwasser, Andrew Davis, Steve Sembler (former Senior Vice President of Neurology and Other), and Sandeep Lalilt (Senior Director of Marketing) held a meeting to discuss pricing. *The Wall Street Journal* reported that Pearson wanted to dramatically increase prices to reach profit targets, while the rest of the group recommended smaller price increases implemented over time. At the Senate hearing, Schiller confirmed that despite the recommendation of the business unit, "Mr. Pearson made a decision to go with the higher price." In a written statement to the Senate Aging Committee, Pearson admitted that he, "as [Valeant's] leader, was too aggressive - in pursuing price increases on certain drugs." At the Senate hearing, Pearson confirmed his hands-on style, testifying in response to questions about patient complaints that "we do track every patient that calls and make sure that it's run to the ground" and "I read the reports."

292.    In a May 28, 2014 conference call with investors, Schiller stated he and Pearson "religiously track each deal on a quarterly basis," adding: "Our Board of Directors receives a report every quarter on each deal. We review every quarter and ask ourselves how are we doing,

we are our own biggest critics." Later the same day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson stated "we're tracking every product around the world."

293.    Further, throughout the Relevant Period the Individual Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, and strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products. The Individual Defendants voluntarily and repeatedly chose to discuss those issues throughout the Relevant Period. Pearson, Schiller, and Rosiello, moreover, executed SOX certifications attesting to the accuracy and truthfulness of Valeant's financial reporting. They also participated in the drafting, preparation, or approval of the various SEC filings, releases, and other public statements detailed in this Complaint and, because of their managerial positions, had control over the information that was disclosed and the true facts relating to those disclosures.

294.    The Individual Defendants were active and culpable participants in the fraudulent scheme and course of business alleged herein by virtue of their receipt of information reflecting the true facts regarding Valeant, their control over or receipt of Valeant's materially misleading misstatements, or their associations with the Company that made them privy to confidential proprietary information concerning Valeant's unsustainable business model and its reliance on deceptive practices. The ongoing fraud as described in this Complaint was, moreover, pervasive, multi-faceted, and carefully designed—a scheme that could not have been perpetrated for so many years without the knowledge or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

295.    Indeed, as detailed above, Valeant has **admitted** that several Defendants' statements during the Relevant Period were false or misleading, that Carro and Schiller engaged in "improper conduct," and that the Company had an unethical "tone at the top."

296.    On February 3, 2016, Valeant admitted that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false. On February 22, 2016, Valeant issued a press release wherein the Company stated it had improperly recognized revenues. On March 21, 2016, the Company issued a press release and Form 8-K disclosing that it had material weaknesses in internal controls and the 2014 10-K and three 10-Qs during 2015 could no longer be relied on.

297.    Further, Schiller was accused of "improper conduct" and the Company "determined that the tone at the top of the organization and the performance-based environment . . . may have been contributing factors resulting in improper revenue recognition.[12] Valeant asked Schiller to resign from the Board and forced Pearson and Carro out, quickly replacing them.

298.    During the congressional hearings into Valeant's conduct, Pearson submitted a written statement admitting "the company was too aggressive and I, as its leader, was too aggressive - in pursuing price increases on certain drugs." He said he "regret[ted] pursuing transactions where a central premise was a planned increase in the prices of the medicines, such as our acquisitions of Nitropress and Isuprel. He further acknowledged in his written statement:

---

[12] Valeant regularly reported non-GAAP financial disclosures in an effort to make Valeant appear more profitable. On December 4, 2015, the SEC raised concerns regarding the "overall format and presentation of the non-GAAP measures" and regarding the prominence given to such numbers. In a March 18, 2016 letter to the Company, the SEC noted "over the past four years, you have reported approximately $9.8 billion of non-GAAP net income" compared to having "reported [a] GAAP net loss of approximately $330 million." The Individual Defendants' insistence on providing opaque and misleading disclosures and resistance to the SEC's repeated requests for reform further indicates their scienter. On April 8, 2016, the Company informed the SEC it would change its approach to non-GAAP financial measures.

> In retrospect, we relied too heavily on the industry practice of increasing the price of brand name drugs in the months before generic entry. Instead, in my view, we should have abandoned the transaction with Marathon when it became clear the expected arrival of generic competition made the economics of the deal dependent on significant price increases.

Pearson also admitted: "Yes. Our pricing has driven more growth than volume, although that is changing over time."

299.    Senator McCaskill noted that since 2013 price had been more responsible for growth than volume in all quarters except one, and Pearson confirmed that was correct. That admission contradicted Pearson's April 29, 2015 statement and his October 14, 2015 letter to Senator McCaskill, in which Pearson claimed "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

300.    Schiller admitted during the hearing that the previously concealed risks of the Company's price gouging practices included "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

301.    Additionally, Schiller effectively admitted that Valeant's business strategy was neither sustainable nor more profitable, a notion Defendants previously denied repeatedly during the Relevant Period. Schiller did so by acknowledging "we made a lot of mistakes" and would no longer pursue such "aggressive" price increases and would be lowering prices. Schiller also admitted they were "too aggressive" in raising the prices of Nitropress and Isuprel, and said "[w]e are not going to be looking for those kinds of acquisitions going forward." Schiller also acknowledged that Valeant would spend more heavily on R&D in the future.

302.    Finally, in connection with the congressional probes, Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0. Philidor's counsel, in a written response, said "Philidor concluded that Valeant's conduct was

consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor." Philidor thus confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship.

### B. The Individual Defendants Were Intimately Familiar with Valeant's Relationship with Philidor.

303. The Individual Defendants were personally aware that Valeant used Philidor and its secret network of pharmacies to engage in deceptive practices, and that the Company's relationship with Philidor was being concealed from investors. The Individual Defendants were also intimately involved in the acquisition of Medicis, which employed an AF strategy and led to the formation of Philidor on January 2, 2013.

304. Additionally, on January 3, 2013, Valeant announced the hiring of Kornwasser. Kornwasser and Tanner were Valeant's main contacts for Philidor. Tanner reported to Kornwasser, who reported to Pearson. Kornwasser's position and compensation within Valeant make clear that Philidor was of critical importance to the Company: he received over $8.8 million in total compensation (cash and stock awards) in his first year of employment.

305. Further, Pearson, Schiller, and other senior executives signed the Philidor agreements, and Pearson and other executive officers often touted Valeant's new "alternative fulfillment program." The Individual Defendants knew that several Valeant employees were assisting in the formation of Philidor, working at Philidor, and eventually transferred employment to Philidor, where those employees (both while still employed at Valeant and after transferring to Philidor) would oversee the deceptive business practices designed to artificially boost the sales and sale prices of Valeant drugs.

306. Before obtaining the option to acquire Philidor, Pearson, Schiller, and Valeant's Board performed due diligence, including multiple site visits. Indeed, the majority of Valeant's

Board, including the entire Audit and Risk Committee, toured the Philidor facility in Pennsylvania in person before the transaction. Additionally, Valeant's entire Board, including the Finance and Transactions Committee and the Audit and Risk Committee, reviewed and approved the Philidor transaction and accounting treatment that violated GAAP.

307.    Valeant effectively controlled Philidor from the day it was created. Philidor was formed to orchestrate Defendants' fraudulent scheme to inflate revenues. Valeant had a contractual right to inspect Philidor's books, records, and facilities and to audit its practices for compliance and either did so—and thus knowingly approved of the deceptive practices—or was severely reckless in failing to do so. The deceptive practices were widely known, discussed, and even documented in Philidor's training manuals. Philidor was included in Valeant's internal control testing and internal audit program for 2015. Further, Valeant and Philidor formed a joint steering committee that held regular meetings to discuss, among other things, Philidor's "Strategic Plan," contractual obligations with TPPs, and "internal policies, manuals and processes."

308.    Notably, on March 9, 2015, Kellen sent an email to Pearson updating him on their earlier conversation, stating "Met with Deb [Jorn]. . . . Suggested we get all the DMs [District Managers] in for a day. . . goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out. That [sic] will help fuel growth." Pearson responded, "Good stuff." Philidor managers were invited to meet with Valeant's Board in July 2015.

309.    Defendants also monitored the network of pharmacies through which Philidor operated. For example, Valeant made approximately 75 shipments to R&O between January and August 2015 and received millions of dollars in payment directly from R&O in return. On

September 4, 2015, after R&O began withholding invoices due to its suspicion of fraudulent conduct, Valeant's general counsel sent a letter to R&O's owner seeking "immediate payment." In the October 19, 2015 conference call, Pearson told investors that R&O was a part of Valeant's specialty pharmacy network and discussed the lawsuit.

310.    On October 19, 2015, as questions about Philidor arose, Pearson, at a conference attended by Rosiello and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors." Pearson repeated that at the October 26, 2015 conference attended by Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen and added that Philidor was purportedly "independent" and sales through it were "less profitable." Just days later, on October 30, 2015, as Philidor's improper practices were publicly revealed, Valeant announced Philidor would cease operations. Defendants' decision to shut down Philidor so quickly shows they were aware of Philidor's deceptive practices.

311.    Additionally, when Citron Research issued its report questioning whether Valeant was inflating revenue through Philidor, Pearson, Ingram, and Carro all publicly defended Valeant's accounting. On October 26, 2015, Ingram noted the entire Board and Audit Committee had reviewed and confirmed the appropriateness of the accounting relating to Philidor. The 3Q15 10-Q Valeant filed that same day, which Pearson and Rosiello signed, repeated that fact.

### C.    Valeant Refused to Pursue Remedies Against Wrongdoers.

312.    Valeant's failure to pursue remedies against Pearson, Schiller, Philidor, and Philidor executives indicates the deceptive business practices alleged in this Complaint were fully approved by Valeant senior executives.

313.    In 2014, Valeant instituted a clawback policy that allowed the Company to recover incentive compensation from management if a restatement was required within three

years of the relevant period and an executive was found to have participated in fraudulent or illegal conduct. But as Ingram noted, the Valeant Board approved the accounting for Philidor and thus, notwithstanding that clawback right, the Board has taken no public action to recover payments to Pearson, Schiller, or the other executives.

314.    Indeed, Valeant retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, along with other financial benefits, although Pearson was only supposed to receive a performance bonus but no salary for 2016, a month after announcing that he would be replaced as the CEO. Valeant has since provided him a $9 million severance.

315.    Similarly, Valeant's purchase option agreement with Philidor provided broad indemnification rights to the Company, including that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties." The purchase option agreement further provided, however, that such liability "shall be reduced by the extent . . . that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer." Rather than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015.

     **D.**    **The Stream of Executive Departures Amidst the Fallout from the Fraud at Valeant Further Indicates Defendants' Scienter.**

316.    Widespread executive and director departures, including all of the Individual Defendants, in close temporal proximity to revelations regarding the deceptive practices by Valeant and Philidor, further indicate Defendants' scienter.

317.    On April 29, 2015, just a few months before the scandal reached the public and just after Valeant's false 2014 financial statements were issued, the Company announced that Schiller would be leaving his position as CFO once a successor was appointed.

318.     Valeant's EVP/Company Group Chairman Laizer Kornwasser left the Company in July 2015. CNBC subsequently attempted to contact Kornwasser, but received a call from Valeant's crisis management department who said Kornwasser was not interested in discussing Valeant or Philidor. Congressman Elijah Cummings noted Kornwasser was never made available when the House Oversight Committee asked Valeant to produce him for an interview.

319.     On or about March 2, 2016, it was reported that Deborah Jorn, head of the U.S. Gastrointestinal and Dermatology divisions, was "leaving the company effective immediately." She was responsible for some of Valeant's top-selling drugs, including Jublia, which was sold in massive quantities through Philidor.

320.     On March 21, 2016, Valeant issued a press release regarding the restatement and material weaknesses of its internal controls, and confirmed Pearson would be leaving the Company. The Company also admitted that Schiller and Carro had engaged in "improper conduct" and provided inaccurate information to the ad hoc committee investigating the false revenues. Schiller was asked to resign from the Board, and Carro was replaced as Controller.

321.     On April 29, 2016, Valeant announced that seven of its Board members— including Pearson and Schiller, as well as Mason Morfit, Provencio (chair of the Audit Committee), Goggins, Ronald Farmer, and Melas-Kyriazi (a member of the Audit Committee)— would not be standing for re-election. Notably, Provencio, Goggins, and Morfit were also members of the ad hoc committee.

322.     On May 20, 2016, Valeant stated in an SEC filing that Brian Stolz, who was involved in the price increases for Valeant drugs, had resigned as Senior Vice President of Neurology, Dentistry and Generics.

323.     Finally, Rosiello and Kellen left the Company on December 31, 2016.

**E.      Pearson Actively Misled Bill Ackman, a Significant Valeant Investor.**

324.    The fact that Pearson concealed his deceptive practices from Ackman, a large investor with whom Pearson had a cooperative business relationship, provides another strong inference of Pearson's scienter. Although Ackman met with Pearson on many occasions to discuss Valeant's business, Pearson kept Ackman in the dark regarding the deceptive practices herein, while using Ackman to refute Allergan's claims and defend Valeant's business model.

325.    When Allergan resisted Valeant's takeover attempt and challenged the sustainability of Valeant's business and its pricing practices (claims that Valeant denied), Pershing Square engaged in further due diligence before investing $4 billion in Valeant in early 2015. Ackman and Pearson had frequent contact, through calls, emails, and dinners. Ackman also introduced other investors to Pearson, offered to help Pearson prepare for earnings calls, and gave advice after those calls. In short, during 2014 and 2015, Ackman had numerous conversations with Pearson about Valeant's business.

326.    Despite those extensive contacts and Ackman's "full access to management," Pearson concealed the extent of Valeant's price gouging and other deceptive practices from Ackman to have Ackman publicly endorse Valeant's "currency," i.e., stock value, during the attempted Allergan acquisition and defend Pearson and Valeant's business practices. For example, on April 22, 2014, Pearson emailed Ackman, asking him to "emphasize [the] quality of our company" to the media.

327.    On April 9, 2015, Ackman emailed Warren Buffett in response to criticism of Valeant and Pearson by Buffett's partner, Charlie Munger, vice-chairman of Berkshire Hathaway. Ackman wrote that Munger "has gotten this one wrong," that "[w]e have gotten to know Valeant and Pearson well over the last year," and that others also "hold Mike Pearson in extremely high regard." Ironically, Ackman claimed that Pearson was "an extremely direct

person," and offered to set up a meeting to "meet Mike Pearson and ask him anything you would like." Ackman continued stating "Mike would like the opportunity to clear his reputation in response to Charlie's recent comments." Buffett suggested that Ackman contact Munger directly.

328.    On April 11, 2015, Ackman sent an email to Munger. He claimed there "was a lot of misinformation disseminated by Allergan about Valeant," and "[p]erhaps that is the source of your misinformation." Ackman asked him to meet with Pearson, stating, "I think you have the facts wrong," and "it seems fair that you would give Mike an opportunity to respond to your concerns." Further demonstrating Ackman's belief that Allergan's claims were false and revealing the extent of his ignorance about the true state of affairs at Valeant, Ackman even claimed that Pearson followed a "rational approach to operations" and that "Valeant stock has been and continues to remain perennially undervalued," even though it was trading at over $200 per share.

329.    As late as October 6, 2015, Ackman had not been told of the extent of Valeant's price gouging. In a media interview that day, Ackman claimed a "[v]ery small part of Valeant's business is repricing drugs" and said it was price increases by other companies that were resulting in Valeant getting "dragged into the story." Ackman went on to claim Valeant was "the most undervalued" stock Pershing Square owned at the time.

330.    After the truth regarding Valeant's deceptive practices came to light and Ackman joined the Board, Ackman dramatically reversed course in his defense of Pearson and Valeant's business practices. Ackman testified to the Senate under oath that he was unaware of what he called the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cuprimine, Isuprel, and Nitropress, and testified that Pershing Square did not approve of the "rapid and large increases in the prices of certain drugs." Ackman testified, "[c]learly [there]

were things I did not understand about the business."  Ackman also told the Senate Aging Committee, and repeated on CNBC and in other media interviews, that replacing Pearson as CEO was "appropriate."

**F.    Defendants Had Significant Financial Motives to Defraud Investors.**

**1.    Valeant's executive compensation system gave Defendants a strong incentive to artificially inflate the prices of Valeant securities.**

331.    Valeant's unusual compensation structure provided incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination. That emphasis on results over ethics led to a culture of fraudulent practices.

332.    During a May 28, 2014 conference, Pearson acknowledged that Valeant's compensation system depended entirely on increasing the stock price:

> So, our Company senior management and the Board -- we -- there's only one metric that really counts, and it's total return to shareholders. That's how we're paid. We have a unique pay model, that at least we -- at least -- if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

333.    A December 12, 2013 Board presentation regarding Valeant's 2014 budget reflected those aggressive targets, noting "[b]udget reflects stretched targets for all business units," and there would be "[n]o bonuses to be paid for performance <90% of base budget."

334.    Valeant's senior executives received millions of dollars for achieving the increasingly aggressive financial targets. For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million. Under the bonus program, however, they could earn multiples of their base salary. For example, Pearson received an $8 million bonus and Schiller received a $2.4 million bonus.

335.    Indeed, industry observers noted Valeant's compensation scheme paid Pearson "like a hedge fund manager." For example, on April 22, 2014, the Company filed a proxy

statement with the SEC disclosing that the value of Pearson's shares on March 31, 2014 was approximately $1.3 billion. During an April 22, 2014 presentation in New York, Ackman appeared with Pearson and described the $1.3 billion package as "one of the more unusual and leveraged shareholder aligned compensation packages we've ever seen." Ackman also highlighted that a large portion of Pearson's compensation was tied to the grant of performance share units that vest only if he delivered incredibly aggressive annual returns over three years of between 15% and 60%, which compounded each successive year.

336.    Valeant's compensation program accordingly incentivized Pearson and other Valeant executives to use any means necessary to increase the stock price through 2017 at the expense of the long-term health of the Company and shareholder interests. Further, Pearson was allowed to effectively cash out a portion of his stock, pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

337.    Motivated by those personal financial incentives, Pearson made statements to drive up the price of Valeant stock, including in an October 27, 2014 letter to Allergan's board of directors in which Pearson stated "[w]e believe our stock is trading at artificially low levels."

338.    On January 13, 2015, the Company filed a Form 8-K announcing it had entered into an amended and restated employment agreement with Pearson. Pearson stopped earning an annual base salary, but his "target bonus opportunity" was increased from $6 million to $10 million. Again, as large as it was, the cash bonus paled in comparison to the hundreds of millions of dollars in compensation Pearson would receive if he successfully drove Valeant's share price higher.

339.    During the Relevant Period, Schiller also had millions of dollars of his executive compensation connected with meeting aggressive share price increases.

340.   On top of their extreme compensation, Pearson and Schiller were permitted personal use of Valeant's $60 million fleet of private jets which were used by them to fly friends and family for vacations.

341.   On March 21, 2016, Valeant admitted "the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the press release.

342.   The "tone at the top" material weakness further supports an inference of scienter as accounting and internal control guidance makes clear the importance "top management" has setting an appropriate tone. *See* SEC Staff Accounting Bulletin No. 99, at 16. As CEO during the Relevant Period, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation, which he failed to do. As the COSO Framework states, "[t]he influence of the CEO on an entire organization cannot be overstated." COSO Framework at 84.

**2.      Defendants inflated Valeant's stock price to facilitate the Company's acquisitions.**

343.   In addition to personal compensation, the Individual Defendants were motivated to conceal their fraudulent business practices described in this Complaint to artificially inflate the prices of Valeant securities so Defendants could more cheaply acquire other companies and further Valeant's acquisition strategy.

344.   For example, in 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock. Defendants thus had an incentive to increase the price of

Valeant shares to hit or exceed their $46 billion offer to Allergan, which was to be substantially funded with Valeant shares. On May 28 and 29, 2014, Valeant held meetings with some of Allergan's largest shareholders to obtain their support for Valeant's bid. Ackman reported that Allergan's shareholders would support the transaction if Valeant could "deliver $180 a share in Valeant in the value of the bid." The higher Valeant's stock price, the lower the cash required to deliver $180 per Allergan share.

345. Valeant also took advantage of the artificially inflated price of its securities to conduct numerous debt and equity offerings during the Relevant Period. For example, Valeant used proceeds from its $9.5 billion offering of senior notes in March 2015 to acquire Salix, and proceeds from its $3.2 billion offering of senior notes in July 2013 to acquire Bausch & Lomb.

## XII.  CLAIMS FOR RELIEF

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5**
**(Against All Defendants)**

346. Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-345 above as if fully set forth in this paragraph.

347. During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

348. Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to their transactions in Valeant stock, notes, and options.

349. In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

350. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in Valeant stock, notes, and options during the Relevant Period. Plaintiffs transacted in Valeant securities at artificially inflated prices and experienced losses when the artificial inflation was removed from the securities as a result of the revelations and price declines detailed in this Complaint. Plaintiffs would not have purchased, acquired, or sold Valeant securities at the prices they paid or received, or at all, if they had been aware that those prices had been affected by Defendants' false or misleading statements and omissions.

351. By virtue of the conduct alleged in this Complaint, Defendants have each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and are liable to Plaintiffs.

## COUNT II
## VIOLATION OF SECTION 18(a) OF THE EXCHANGE ACT
### (Against Defendants Valeant, Pearson, and Schiller)

352.  Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-345 above as if fully set forth in this paragraph. As to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made, and included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

353.  As alleged above, Defendants filed or caused to be filed with the SEC documents regarding Valeant that contained misstated material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

354.  As discussed above, in deciding whether to purchase, sell, or hold Valeant securities, Senzar investment personnel read and relied on, among other things, numerous statements contained in documents Valeant filed with the SEC. *See* ¶¶ 281-84.

355.  Plaintiffs' reliance was reasonable. Plaintiffs read and relied on those documents not knowing they contained materially false statements or omissions. Had Plaintiffs known the true facts, they would not have purchased, acquired, or sold Valeant securities or would not have done so at the prices they paid or received. At the time of their transactions in Valeant securities, Plaintiffs were not aware of the false or misleading statements or omissions alleged in this Complaint and could not have reasonably discovered those untruths or omissions.

356.  Defendants' materially false or misleading statements artificially inflated the prices of Valeant securities. When the truth began to emerge about the false or misleading

statements and omissions, the prices of Valeant securities declined significantly and Plaintiffs were damaged.

357.    By virtue of the conduct alleged in this Complaint, the Defendants named in this Count have each violated Section 18(a) of the Exchange Act (15 U.S.C. § 78r), and are liable to Plaintiffs.

**COUNT III**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Valeant, Pearson, Schiller, and Rosiello)**

358.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1-345 above as if fully set forth in this paragraph.

359.    During their tenures as officers or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers or directors of Valeant, these Defendants had the power and authority to cause Valeant to engage in the conduct detailed in this Complaint. These Defendants were able to, and did, control, directly and indirectly, the decision-making of Valeant, including the content and dissemination of the Company's public statements and filings described in this Complaint, thereby causing the dissemination of the materially false or misleading statements and omissions as alleged in this Complaint.

360.    Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the Individual Defendants (such as Pearson, Schiller, and Rosiello) and all of its employees and subsidiaries.

361.    In their capacities as senior corporate officers or directors of Valeant, and as more fully described throughout this Complaint, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above. These Defendants had direct and supervisory

involvement in the day-to-day operations of Valeant, and had access to non-public information regarding the Company's deceptive and risky business practices. Valeant, Pearson, Schiller, and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Sections 10(b) and 18(a) of the Exchange Act and SEC Rule 10b-5, as detailed in this Complaint.

362.    As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

363.    As set forth above, Valeant violated Sections 10(b) and 18(a) of the Exchange Act. By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with Valeant, and to the same extent as Valeant is liable to Plaintiffs. Valeant exercised control over the Individual Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable participation, is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with the Individual Defendants, and to the same extent as the Individual Defendants are liable to Plaintiffs.

364.    By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and are liable to Plaintiffs.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, as allowed by law;

B.      Awarding Plaintiffs extraordinary, injunctive, or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated:  February 16, 2018                           Respectfully submitted,

                                                    By:  */s/ David J. Libowsky*

                                                    David J. Libowsky
                                                    BRESSLER, AMERY & ROSS, P.C.
                                                    325 Columbia Turnpike, Suite 301
                                                    Florham Park, NJ 07932
                                                    Telephone: (973) 514-1200
                                                    Facsimile:  (973) 514-1660
                                                    dlibowsky@bressler.com

                                                    Steven E. Fineman (*pro hac vice* forthcoming)
                                                    Daniel P. Chiplock (*pro hac vice* forthcoming)
                                                    Michael J. Miarmi (*pro hac vice* forthcoming)
                                                    LIEFF CABRASER HEIMANN &
                                                    BERNSTEIN, LLP
                                                    250 Hudson Street, 8th Floor
                                                    New York, NY 10013-1413
                                                    Telephone:  (212) 355-9500
                                                    Facsimile:   (212) 355-9592
                                                    sfineman@lchb.com
                                                    dchiplock@lchb.com
                                                    mmiarmi@lchb.com

Richard M. Heimann (*pro hac vice* forthcoming)
Bruce W. Leppla (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008
rheimann@lchb.com
bleppla@lchb.com

Sharon M. Lee (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
2101 Fourth Avenue, Suite 1900
Seattle, WA 98121-2315
Telephone:  (206) 739-9059
slee@lchb.com

*Attorneys for Plaintiffs*

135