## APPENDIX TO COMPLAINT

**I.      STATEMENTS REGARDING VALEANT'S BUSINESS MODEL AND FINANCIAL RESULTS**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Valeant's Business Model and Financial Results | Why Statements Were False or Misleading When Made |
|---|---|---|
| Goldman Sachs Healthcare CEOs Unscripted:  A View from the Top Conference on January 7, 2014<br><br>Maker(s) of statement:<br><br>Pearson; Valeant | "The AF program was I think rolled out a little bit too quickly and there were lots of bugs in it and we have a next generation that we're going to – which we are implementing, which we aren't going to talk about the details of, but net-net I think Solodyn, it's a lot less important to us now than when we – than it was to Medicis obviously." | Pearson's statement was false or misleading when made, for the reasons detailed in the Complaint.  *See, e.g.*, ¶¶ 35-140. In sum:<br><br>(1)  Valeant's business strategy relied on a series of deceptive practices, which drove the Company's revenues from its key dermatology, neurology, and other products. Those practices included massive price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors (including insurance companies), physicians, and others to obtain reimbursement for Valeant's high-priced drugs.<br><br>(2)  Defendants' business model relied on improper practices by Philidor RX Services, LLC, a specialty mail-order pharmacy Defendants set up along with a host of shell companies owned through Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States.  Unbeknownst to investors, (i) Philidor was formed to increase the sales prices of Valeant drugs and avoid substitution of those drugs with less-expensive |

| | | generic competitors; (ii) Valeant employees worked at Philidor; (iii) Valeant was Philidor's only client and had the ability to shutter its business; (iv) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (v) Valeant was consolidating Philidor's financial results as its own, and had obtained explicit rights to direct Philidor's activities; and (vi) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling drugs in states where it did not obtain, or had been denied, a license. |
| --- | --- | --- |
| | | (3)  Valeant's reported revenues, earnings per share ("EPS"), and financial forecasts to investors during the Relevant Period depended on the Company's ability to continue to conceal its deceptive practices and did not accurately portray the Company's financial performance and business prospects.  To that end, Valeant improperly recognized Philidor-related revenue, in violation of U.S. Generally Accepted Accounting Principles ("GAAP"), causing Valeant's revenues, net income, and EPS to be materially misstated during the Relevant Period. |
| | | (4)  Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations. |
| | | (5)  Defendants' undisclosed practices significantly increased Valeant's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, and decreased sales. |
| 4Q13 and FY 2013 earnings press release issued on February 27, 2014 | "Valeant's Developed Markets revenue was $1.6 billion, up 122% as compared to the fourth quarter of 2012. This increase was primarily led by the | Same as above. |

| | | |
|---|---|---|
| <u>Maker(s) of statements</u>:<br>Valeant | acquisition of Bausch + Lomb, which was completed on August 5, 2013. Same store organic product sales growth was 13%, excluding the impact of the genericization of the Zovirax franchise, Retin-A Micro and BenzaClin. The growth in the Developed Markets was driven by continued growth in certain dermatology prescription brands, our aesthetics, consumer, neurology and other and oral health portfolios, and our Canadian business unit." | |
| 4Q13 and FY 2013 earnings conference call on February 27, 2014<br><br><u>Maker(s) of statements</u>:<br>Pearson; Valeant | "When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally.  And so we have been able to take advantage of that and grow those products." | Same as above. |
| 2013 Form 10-K issued on February 28, 2014<br><br><u>Maker(s) of statements</u>:<br>Pearson (signed); Schiller (signed); Valeant | (1) "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies," and "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care."<br><br>(2) "The growth of our business is further augmented through our lower risk research and development model. This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. This is achieved primarily as follows:<br><br>    &bull;  focusing our efforts on niche therapeutic | Same as above. |

| | areas such as eye health, dermatology and podiatry, aesthetics, and dentistry, including life-cycle management programs for currently marketed products; and<br>• acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities." | |
|---|---|---|
| 1Q14 earnings press release issued on May 8, 2014<br><br>Maker(s) of statement:<br>Pearson; Valeant | (1) Reporting "an increase of 77% over the prior year," which "[e]xceeded our expectations," along with "[p]ositive organic growth in the U.S. . . .";<br><br>(2) Pearson: "[o]ur first quarter results demonstrate the strong, durable nature of our diversified business model." | Same as above. |
| 1Q14 earnings conference call on May 8, 2014<br><br>Maker(s) of statement:<br>Pearson; Valeant | "I think the other thing is – that we've worked on is a much more sophisticated alternate fulfillment system that we've implemented the US, which is really helping. Those scripts don't show up in IMS, in terms of what's doing, but we're very pleased that Solodyn is now growing. And we've applied that to a number of our other products, which is also helping in terms of the growth." | Same as above. |
| 1Q14 Form 10-Q issued on May 9, 2014<br><br>Maker(s) of statements:<br>Pearson (signed); Schiller (signed); Valeant | "The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense." | Same as above. |
| 2Q14 earnings press release issued on July 31, 2014<br><br>Maker(s) of statements: | (1) "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year."<br><br>(2) "Excluding the impact of generics, same store sales organic product sales growth was 10%, and pro | Same as above. |

| | | |
|---|---|---|
| Pearson; Valeant | forma organic product sales growth for Valeant was 11%. As mentioned in previous conference calls, we continue to expect a significant acceleration of organic growth in the second half of the year." | |
| | (3) Pearson: "Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter. As we look across the entire business, I have never been more confident about the growth trajectory across the entire company." | |
| 2Q14 earnings conference call on July 31, 2014<br><br>Maker(s) of statements:<br>Pearson; Valeant | "Turning to medical dermatology. . . The business has now stabilized, with a new management team. And the branded market share has increased across all key Medicis products since the beginning of 2014. This includes Solodyn, Ziana, and Zyclara.<br><br>Moving to our performance by business. I would like to touch on the growth and performance of our developed market operations, excluding the Bausch & Lomb businesses. In the US, dermatology grew approximately 7% in the quarter, including the headwinds from generics, driven by the continued growth of Acanya, Targretin, and Elidel.<br>* * *<br>Given the strong reception from both physicians and patients of our recently launched products Jublia, Ultra, and Luzu, each of them has exceeded our expectations. As I mentioned, after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts. This trend is expected to accelerate, as regulatory approval for marketing materials are received and our dermatology sales forces is appropriately trained. | Same as above. |

| | * * *<br>People - a lot of assertions are that it's all about price, but it's not. . . . So I think what we're talking about earlier this morning is probably we will report what the volume and price parts of our organic growth are. And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is . . . .Our sales force in dermatology now has been stable for a few quarters and . . . all our promoted products in dermatology are growing." | |
|---|---|---|
| 2Q14 Form 10-Q issued on August 1, 2014<br><br>Maker(s) of statements:<br>Pearson (signed); Schiller (signed); Valeant | "The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense." | Same as above. |
| 3Q14 earnings press release issued on October 20, 2014<br><br>Maker(s) of statements:<br>Valeant | "Total Revenue [of] $2.1 billion . . . GAAP EPS [of] $0.81, [and] Cash EPS $2.11." The release also reported net income of $275.4 million. . . . "Total same store sales organic growth was 19%, including impact from generics." | Same as above. |
| 3Q14 earnings conference call on October 20, 2014<br><br>Maker(s) of statements:<br>Pearson; Valeant | "Revenues for our dermatology business, including the recent Precision acquisition, grew 33% quarter over quarter. The turnaround of our dermatology business is continuing. New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well. This has resulted in market share and revenue gains across the portfolio, including launch products.<br><br>Elidel, Acanya, Zyclara, and Ziana have all gained market share since the beginning of 2014. Elidel has | Same as above. |

| | | |
|---|---|---|
| | had an exceptional year, increasing market share from 45% to 52%. And it has overtaken Protopic as the leader in this category.<br><br>After years of declines Solodyn market share has stabilized. On the new products side, both Jublia and Luzu quickly gained share, with Jublia reaching 7% script share of the total onychomycosis market, both branded and generics. And Luzu accelerated its script share to 13% of the branded topical antifungal market. In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%." | |
| 3Q14 Form 10-Q filed on October 24, 2014<br><br>Maker(s) of statements:<br><br>Pearson (signed); Schiller (signed); Valeant | (1) Reporting 3Q14 revenue of $2.056 billion, net income of $275.4 million, and GAAP EPS of $0.81;.<br><br>(2) "The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value." | Same as above. |
| 2015 financial guidance conference call on January 8, 2015<br><br>Maker(s) of statements:<br><br>Pearson; Valeant | "We demonstrated tremendous organic growth improvement in 2014 . . .<br>* * *<br>In conclusion, all the successes from 2014 and our [process] for 2015 and beyond continue to validate that Valeant's business model is both sustainable and value creating. Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014 and 2015 but | Same as above. |

| | strong organic growth for the foreseeable future." | |
|---|---|---|
| 4Q14 and FY14 press release issued on February 22, 2015<br><br>Maker(s) of statements:<br>Pearson; Valeant | (1) For 4Q14, "[r]evenue [of] $2.3 billion . . . GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58." For the full year 2014, "Revenue [of] $8.3 billion . . . GAAP EPS [of] $2.67, [and] Cash EPS [of] 8.34, (excluding Allergan gain)." The release also reported 4Q14 net income of $534.9 million and 2014 net income of $913.5 million, and "Total Same Store Sales organic growth" was 16% and 13% for the 4Q14 and FY 2014, respectively;<br><br>(2) Pearson represented that Valeant's strategy "is paying off for all of our stakeholders" and reporting "[o]utstanding growth in the U.S., most notably dermatology." | Same as above. |
| 4Q14 and FY14 earnings conference call on February 23, 2015<br><br>Maker(s) of statements:<br>Schiller; Valeant | (1) "[r]evenues for our dermatology business were very strong and increased 70% year-over-year";<br><br>(2) "The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.<br><br>Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.<br><br>Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report. This yields an annualized run rate of greater than $250 million for the product." | Same as above. |

| 2014 Form 10-K issued on February 25, 2015<br><br>Maker(s) of statements:<br><br>Pearson (signed); Schiller (signed); Valeant | (1) Reporting 4Q14 revenue of $2.28 billion, net income of $534.9 million, and GAAP EPS of $1.56, and full year 2014 revenues of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67;<br><br>(2) Attributing the source of Valeant's growth to "our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense";<br><br>(3) Claiming "[g]eneric versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies" and "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care[.]" | Same as above. |
| Shelf Registration Statement issued on June 10, 2013 and Form 424B5 Prospectus Supplement issued on March 18, 2015 in connection with Valeant's March 2015 $1.45 billion public offering of common stock<br><br>Maker(s) of statements:<br><br>Pearson (signed Registration Statement); Schiller (signed Registration Statement) ; Valeant | "Salix has a number of pipeline products that may not align with our lower risk, output-focused R&D model[.]" | Same as above. |

| | | |
|---|---|---|
| 1Q15 earnings press release issued on April 29, 2015<br><br>Maker(s) of statements:<br>Valeant | "Same Store Sales Organic Growth was 15%, driven by:<br><br>• Growth from launch brands, including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, Jublia, Luzu, and Ultra Contact Lens<br>• Double digit growth in U.S. businesses such as Contact Lens, Dermatology, Neurology and Other, Obagi, and Oral Health[.]" | Same as above. |
| 1Q15 earnings conference call on April 29, 2015<br><br>Maker(s) of statements:<br>Pearson; Schiller; Valeant | (1) Pearson:  "Our US dermatology business had an outstanding quarter. Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year.<br><br>* * *<br>In terms of price volume, actually volume was greater than price in terms of our growth. Outside the United States it's all volume. . . . And in the US it's shifting more to volume than price, and we expect that to continue with our launch brands. A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take."<br><br>(2) Schiller: "I've completely bought into our unique strategy and culture, the transparency and fact-based  approach to running our business, and our relentless focus on building a great Company and on creating shareholder value.  . . . Valeant's business has never been stronger and its prospects have never been brighter[.]" | Same as above. |
| 1Q15 Form 10-Q issued on April 30, 2015 | (1) Reporting 1Q15 revenue of $2.191 billion; | Same as above. |

| | | |
|---|---|---|
| Maker(s) of statements:<br><br>Pearson (signed); Schiller (signed); Valeant | (2) "The growth of our business is further augmented through our lower risk, output focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value." | |
| Annual Meeting of Shareholders on May 19, 2015<br><br>Maker(s) of statements:<br>Pearson; Valeant | (1) "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors";<br><br>(2) "We've delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively";<br><br>(3) Valeant had a "unique executive compensation system tied to generating disproportionate returns for our shareholders." | Same as above. |
| 2Q15 earnings press release issued on July 23, 2015<br><br>Maker(s) of statements:<br>Pearson; Valeant | (1) "Same Store Sales Organic Growth was 19%," driven by, *inter alia*, "U.S. businesses, driven by the strength of dermatology, contact lenses, dental and Obagi."<br><br>(2)  Pearson:  "We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth. Our strong second quarter results were driven by outperformance in our U.S. businesses, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions." | Same as above. |
| 2Q15 earnings conference call on July 23, 2015 | (1) "We have now delivered four consecutive quarters of more than 15% same-store organic growth. Strong performance throughout our | Same as above. |

A-11

| | |
|---|---|
| Maker(s) of statements: <br><br> Pearson; Valeant | businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call. <br><br> * * * <br><br> Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter. The exceptional growth of our US businesses driven by the strength of dermatology, contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea. <br><br> * * * <br><br> Jublia is now our second largest product with annual run-rates sales of approximately $450 million. . . . Our US dermatology business had another excellent quarter with our launch brands leading the way. Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1[.]"; <br><br> (2) "I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza -- we're going to lose Glumetza within six months -- often price increases are taken at the end. So that was just consistent with what most companies do.  Our view on pricing -- across most of our portfolio, we do not take prices. Outside the US, there's like zero price. I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. But our base strategy is, how do we grow organically through volume, which is -- I think this quarter, we once again exhibited our ability to do so." | |

| | | |
|---|---|---|
| 2Q15 Form 10-Q issued on July 28, 2015<br><br>Maker(s) of statements:<br><br>Pearson (signed); Rosiello (signed); Valeant | (1)  Reported revenues for the six months ended June 30, 2015 of $4.923 billion;<br><br>(2)  "As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the copay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%") . . ."; <br><br>(3)  "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense." | Same as above. |
| 3Q15 Form 10-Q issued on October 26, 2015<br><br>Maker(s) of statements: | (1)  Reporting the Company's revenue for the nine months ended September 30, 2015 of $7.71 billion;<br><br>(2)  "Excluding the items described above, we | Same as above. |

| | | |
|---|---|---|
| Pearson (signed); Rosiello (signed); Valeant | realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia® (launched in mid-2014), (ii) the Retin-A® franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) Solodyn®, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®";<br><br>(3) "The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense[.]" | |

II.   **STATEMENTS REGARDING VALEANT'S RELATIONSHIP WITH PHILIDOR AND OTHER PURPORTEDLY INDEPENDENT ENTITIES**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Philidor and Other Purportedly Independent Entities | Why Statements Were False or Misleading When Made |
|---|---|---|
| Valeant Form 10-Qs for 1Q13, 2Q13, 3Q13, 1Q14, 2Q14, 3Q14, 1Q15, and 2Q15; and Form 10-Ks for 2013 and 2014.<br><br>Maker(s) of Statement:<br><br>Pearson (signed all); Schiller (signed 10-Qs and 10-Ks before 2Q15); Rosiello (signed 2Q15 10-Q); Valeant | "pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control" | Those statements were false or misleading when made because:<br><br>(1)  as detailed in ¶¶ 52-79 and 90-100 of the Complaint, Philidor was formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant-branded pharmaceutical products and to avoid substitution of Valeant drugs with competing generic products; Valeant employees worked at Philidor; Valeant was Philidor's only client and had the ability to shutter its business; Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor's activities; and those facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;<br><br>(2)  as detailed in ¶¶ 52-79 and 90-100 of the Complaint, Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license; and<br><br>(3)  as detailed in ¶¶ 109-26 of the Complaint, Valeant improperly recognized Philidor revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated. |

III.   **STATEMENTS REGARDING INTERNAL CONTROLS, LEGAL COMPLIANCE, AND THE INTEGRITY OF ITS REPORTED FINANCIAL RESULTS**

A.   **Statements Regarding Internal Controls**

| Document/"Maker(s)" of the Statement(s) | Statements Regarding Internal Controls | Why Statements Were False or Misleading When Made |
|---|---|---|
| 1Q13 10-Q<br><br>Maker(s) of statement:<br>Pearson (signed); Schiller (signed); Valeant | "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013." | Those statements were false or misleading when made, for the reasons detailed in the Complaint. *See, e.g.,* ¶¶ 35-140. In sum:<br><br>(1) Valeant's business strategy relied on a series of deceptive practices, which drove the Company's growth in revenues and sales of its key dermatology, neurology, and other products. Those practices included massive price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors, physicians, and others to obtain reimbursement for Valeant's high-priced drugs.<br><br>(2) Defendants' business model relied on improper practices by Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States. Unbeknownst to investors, (i) Philidor was formed to increase the sales prices of Valeant drugs and to avoid substitution of those drugs with competing generic products; (ii) Valeant employees worked at Philidor; (iii) Valeant was Philidor's only client and had the ability to shutter its business; (iv) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (v) Valeant was consolidating Philidor's results as its own, |

| | | |
|---|---|---|
| | | and had obtained explicit rights to direct Philidor's activities; and (vi) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not obtain, or had been denied, a license. |
| | | (3) Further, Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to prevent the substitution of generic equivalents for Valeant-branded drugs. Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to take into account Valeant's waivers of patient copays. |
| | | (4) Valeant's reported revenues, EPS, and financial forecasts to investors during the Relevant Period depended on the Company's ability to continue to conceal its deceptive practices and did not accurately portray the Company's financial performance and business prospects. To that end, Valeant improperly recognized Philidor-related revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated during the Relevant Period. |
| | | (5) Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations. |

| | | (6) Valeant's undisclosed practices significantly increased the Company's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, violations of contracts, decreased sales, and heightened public scrutiny. Valeant thus was not, as Defendants represented to investors, employing a "lower risk, output-focused research and development model," but rather a strategy that subjected the Company to enormous risk. |
| Valeant Form 10-Qs for  2Q13, 3Q13, 1Q14, 2Q14, 3Q14, 1Q15, 2Q15, and 3Q15; and Form 10-Ks for 2013 and 2014.<br><br>Maker(s) of statement:<br><br>Pearson (signed all); Schiller (signed 10-Qs and 10-Ks before 2Q15); Rosiello (signed 2Q15 and 3Q15 10-Qs); Valeant | Substantially the same as above. | Same as above. |

### B.    Statements in Certifications Under the Sarbanes-Oxley Act of 2002 ("SOX")

| Document/"Maker(s)" of the Statement(s) | Statements in SOX Certifications | Why Statements Were False or Misleading When Made |
|---|---|---|
| SOX certifications in Valeant Form 10-Qs for 1Q13, 2Q13, 3Q13, 1Q14, 2Q14, 3Q14, 1Q15, 2Q15, and  3Q15; and Form 10-Ks for 2013 and 2014.<br><br>Maker(s) of statement:<br><br>Pearson (as to all); Schiller (as to 10-Qs | (1)  the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report";<br><br>(2)    "[b]ased on [his] knowledge, the financial | Those statements were false or misleading when made, for the reasons detailed in the Complaint. *See, e.g.,* ¶¶ 35-140. In sum:<br><br>(1) Valeant's business strategy relied on a series of deceptive practices, which drove the Company's growth in revenues and sales of its key dermatology, neurology, and other products. Those practices included massive |

| | | |
|---|---|---|
| and 10-Ks before 2Q15); Rosiello (as to 2Q15 and 3Q15 10-Qs); Valeant (as to all) | statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in th[e] report"; | price increases for Valeant drugs, which allowed the Company to meet financial targets; routing patients into Valeant's secret network of captive pharmacies that were falsely made to appear independent; using patient assistance and public relations strategies (such as waiving patient copays) to minimize patient complaints; and concealing those practices from payors, physicians, and others to obtain reimbursement for Valeant's high-priced drugs. |
| | (3)  Pearson, Schiller, and/or Rosiello (a) "[d]esigned . . . disclosure controls and procedures, or caused . . . disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which this report is being prepared; (b) "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with [GAAP]"; (c) "[e]valuated the effectiveness of the Company's disclosure controls and procedures and presented in th[e] report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by th[e] report based on such evaluation"; and (d) "[d]isclosed in th[e] report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that ha[d] materially affected, or [wa]s reasonably likely to materially affect, the Company's internal control over financial reporting"; and | (2)  Defendants' business model relied on improper practices by Philidor, which Valeant used to acquire interests in additional retail pharmacies throughout the United States. Unbeknownst to investors, (i) Philidor was formed to increase the sales prices of Valeant drugs and to avoid substitution of those drugs with competing generic products; (ii) Valeant employees worked at Philidor; (iii) Valeant was Philidor's only client and had the ability to shutter its business; (iv) Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; (v) Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor's activities; and (vi) Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not obtain, or had been denied, a license.

(3)  Further, Philidor employees, as well as Valeant employees staffed at Philidor, were instructed to employ a host of deceptive practices—referred to in manuals distributed to employees as "back door approaches" to receiving payment from insurance companies—to prevent the substitution of generic equivalents for Valeant-branded drugs. Those "approaches" included changing prescription codes on claims to require that the prescriptions be filled with Valeant drugs; making claims for refills that were never requested by patients; |
| | (4)  Pearson, Schiller, and/or Rosiello "[d]isclosed, based on [their] most recent evaluation of internal | |

| | | |
|---|---|---|
| | control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):<br><br>    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which [we]re reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and<br><br>    (b)  Any fraud, whether or not material, that involve[d] management or other employees who ha[d] a significant role in the Company's internal control over financial reporting." | misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; and submitting claims that inflated the prices charged by failing to take into account Valeant's waivers of patient copays.<br><br>(4)  Valeant's reported revenues, EPS, and financial forecasts to investors during the Relevant Period depended on the Company's ability to continue to conceal its deceptive practices and did not accurately portray the Company's financial performance and business prospects. To that end, Valeant improperly recognized Philidor-related revenue, in violation of GAAP, causing Valeant's revenues, net income, and EPS to be materially misstated during the Relevant Period.<br><br>(5)  Valeant lacked adequate internal controls, as well as compliance and training programs, and contrary to their representations to investors, Defendants were not committed to compliance with governing legal, regulatory, or contractual obligations.<br><br>(6)  Valeant's undisclosed practices significantly increased the Company's exposure to, among other things, government investigations, regulatory sanctions, criminal charges, reputational harm, violations of contracts, decreased sales, and heightened public scrutiny. Valeant thus was not, as Defendants represented to investors, employing a "lower risk, output-focused research and development model," but rather a strategy that subjected the Company to enormous risk.<br><br>(7)  Accordingly, Defendants' SOX certifications falsely stated the accompanying SEC filings did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made in those filings not misleading. |

| | | |
|---|---|---|
| | | Additionally, SOX required the use of an appropriate framework in making the assessments to which Pearson and Schiller attested in their SOX certifications, such as the Committee of Sponsoring Organizations, Internal Control – Integrated Framework ("COSO Framework"). During the Relevant Period, Valeant's financial statements falsely represented that management's evaluations were based on the COSO Framework. |